# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CHELSEA DIAMOND**, as personal representative of the estate of **DOUGLAS DIAMOND,** deceased,<br><br>    Plaintiff,<br><br>  v.<br><br>**CITY OF SANDY; CLACKAMAS COUNTY; MICHAEL BOYES; WILLIAM WETHERBEE;** and **SEAN COLLINSON**,<br><br>    Defendants. | Case No. 3:22-cv-346-SI<br><br>**OPINION AND ORDER** |

Jesse A. Merrithew, Noah A.F. Horst, and Norah Van Dusen, LEVI MERRITHEW HORST PC, 610 SW Alder Street, Suite 415, Portland, OR 97205. Of Attorneys for Plaintiff.

David C. Lewis and Lauren E. Nweze, CIS LITIGATION, 15875 Boones Ferry Road, Suite 1469, Lake Oswego, OR 97035. Of Attorneys for Defendants City of Sandy, Michael Boyes, and William Wetherbee.

Stephen L. Madkour, Clackamas County Counsel, and Scott C. Ciecko, Assistant County Counsel, OFFICE OF CLACKAMAS COUNTY COUNSEL, 2051 Kaen Road, Oregon City, OR 97045. Of Attorneys for Defendants Clackamas County and Sean Collinson.

**Michael H. Simon, District Judge.**

Douglas Diamond died in 2020 during an encounter with six members of law

enforcement. His daughter, Plaintiff Chelsea Diamond, as personal representative of his estate,

PAGE 1 – OPINION AND ORDER

brings this action against the City of Sandy, Police Officer Michael Boyes, Police Officer William Wetherbee (collectively, the "City Defendants"), and Clackamas County and Sergeant Sean Collinson (collectively, the "County Defendants"). Plaintiff alleges that the acts and omissions of the City and County Defendants violated Mr. Diamond's rights under the Fourth and Fourteenth Amendments to the United States Constitution and state law. The City and County Defendants move separately for summary judgment against all claims (ECF 31, ECF 37).

This Opinion and Order resolves Defendants' objections to three expert declarations submitted by Plaintiff in opposition to Defendants' motions for summary judgment: the Declaration of Dr. J. Matthew Lacy ("Lacy Declaration") (ECF 46), the Declaration of Dr. Jesse L. Wobrock ("Wobrock Declaration") (ECF 47), and the Declaration of Scott DeFoe ("DeFoe Declaration") (ECF 48). Defendants argue that the Lacy and Wobrock Declarations are improper expert opinions under Rule 702 of the Federal Rules of Evidence. The City Defendants also challenge the DeFoe Declaration, as improper under Rule 702, as well as other rules of evidence. This Opinion and Order also resolves Plaintiff's objections to the Declaration of James J. McIntyre ("McIntyre Declaration") (ECF 38) filed by the City Defendants in support of their motion for summary judgment. Plaintiff objects to the McIntyre Declaration as both irrelevant and improperly providing legal conclusions.

On February 6, 2025, the Court held an evidentiary hearing and received testimony from Dr. Lacy and Dr. Wobrock.[1] For the reasons explained below, the Court overrules these objections and will consider all four declarations at summary judgment. For the reasons discussed below, however, the Court does not accept every opinion offered within the challenged

---

[1] The Court does not believe that testimony from either Mr. DeFoe or Mr. McIntyre would be helpful in resolving the pending objections to their declarations, and thus did not request their appearance at the hearing. *See, e.g.*, LR 7-1(d)(1).

declarations and leaves for pretrial resolution the precise contours of the opinion testimony that may be heard by the jury.

## STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*"), 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Thus, a witness may be qualified as an expert upon demonstrating at least a "*minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting with emphasis *Thomas*, 42 F.3d at 1269).

When determining the admissibility of expert testimony, a district court's role under Rule 702 is not to be a "fact finder" but a "gatekeeper." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks omitted). "Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). To fulfill its role as gatekeeper, a district court must "ensure that the testimony is both relevant and reliable" before it deems such testimony admissible. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (cleaned up). Although the "[t]he relevancy bar is low," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), to be sufficiently relevant, the expert opinion evidence must "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. "The question of reliability probes whether the reasoning or methodology underlying the testimony" is valid. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (quotation marks omitted). "The test of reliability is flexible." *Pomona*, 750 F.3d at 1044.

Rule 702 "makes no attempt to set forth procedural requirements for exercising the trial court's gatekeeping function over expert testimony" in part to recognize the flexibility for different circumstances such as reviewing expert testimony in support of motions for summary judgment and *in limine* hearings. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Cortes-Irizarry v. Corporacion Insular*, 111 F.3d 184 (1st Cir. 1997), as "discussing the application of *Daubert* in ruling on a motion for summary judgment"). The 2023 amendments, while "emphasiz[ing] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" in recognition of the essential judicial gatekeeping role with respect to the jury, who "lack the

specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support," again did not "impose[] any new, specific procedures." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Thus, a court's "ingenuity and flexibility in considering challenges to expert testimony under *Daubert*" remain. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## BACKGROUND

On July 3, 2020, officers with the Clackamas County Sherriff's Office ("CCSO") responded to a series of phone calls to emergency services concerning Mr. Diamond's welfare. ECF 40-7 at 7-8; Adel Dep. Tr. 21:15-24 (ECF 45-5 at 7). Mr. Diamond's long-time partner and Mr. Diamond's son-in-law both reported that Mr. Diamond was alone at his home at an RV park, armed, and had recently made comments indicating suicidal thoughts. *See, e.g.*, ECF 40-6 at 2, 5, 9. Sheriff Deputies Gabriel Adel and Christopher Thomas, and Recruit Deputy[2] Jared Riehl arrived on the scene to check on Mr. Diamond. ECF 40-7 at 7; Adel Dep. Tr. 21:15-24; Thomas Dep. Tr. 17:20, 17:23-24 (ECF 31-15 at 5). Mr. Diamond repeatedly refused to take his hands out of his front sweatshirt pocket, and Adel later testified that he could see the outline of a gun in that pocket. Adel Dep. Tr. 42:20-43:1, 46:25-47:3. Adel attempted to have a conversation with Mr. Diamond. *Id.* at 9:6-10:10; 42:20-25. Although Mr. Diamond was initially tense and reluctant to talk, he eventually engaged in speaking with Deputy Adel. *Id.* at 45:17-46:8.

During this conversation, Collinson, Boyes, and Wetherbee—the individual defendants in this case—arrived on the scene. Collinson Dep. Tr. 51:19-21 (ECF 31-11 at 24); Boyes Dep. Tr. 59:10-22 (ECF 40-1 at 21). Without conferring with the officers present, Collinson took

---

[2] Riehl had been with the CCSO since October 2019 and was undergoing 18 months of training to become a Deputy Sheriff. ECF 31-110 at 6. Adel was Riehl's field training officer. Riehl Dep. 10:23-24 (ECF 45-8 at 4).

charge and instructed Mr. Diamond to remove his hands from his pockets. Riehl Dep. Tr. 30:5 (ECF 45-8 at 9); Thomas Dep. Tr. 27:18 (ECF 45-9 at 13); Tr. of Recorded Conversation with Diamond 3:37:24 (ECF 31-9 at 8); *see also* Riehl Dep. Tr. 30:25. When Mr. Diamond did not comply, the encounter escalated. The individual defendants deployed a beanbag shotgun and a TASER, and when neither subdued Mr. Diamond, Collinson charged at him. Collinson Dep. Tr. 61:17-20, 61:25-62:2, 63:1-4, 64:1; Wetherbee Dep. Tr. 39:23-40:2, 41:3-8 (ECF 31-14 at 9-10, 11); Tr. of Recorded Conversation with Diamond 3:37:56-38:01. Collinson grabbed Mr. Diamond's right arm but was unable to restrain Mr. Diamond's left side. Collinson Dep. Tr. 64:20-65:1. Seconds later, Boyes began to fire his handgun, injuring Collinson and killing Mr. Diamond. Boyes Dep. Tr. 81:7-82:4, 92:6-8; 92:17-19. Defendants rely upon the McIntyre Declaration to argue that when the individual defendants used varying levels of force on Mr. Diamond, it was after they had probable cause to arrest him for several felony offenses. Plaintiff relies upon the DeFoe Declaration to argue that the conduct of the individual Defendants did not conform to policing norms and amounted to excessive force.

A key factual dispute is whether Mr. Diamond's left hand stayed in his sweatshirt pocket during the moments leading up to his death. Although the descriptions of what happened are not entirely consistent, four[3] of the five officers whose accounts were provided to the Court agree that they saw Mr. Diamond use his left hand to pull a gun from his pocket. *See* Adel Dep. Tr. 59:2-10 (ECF 40-12 at 14); Wetherbee Dep. Tr. 44:1-2 (ECF 40-14 at 12); Collinson Dep. Tr. 65:2-4; Boyes Dep. Tr. 81:7-82:4. Defendants argue that when Mr. Diamond drew his gun,

---

[3] There were six officers present at the scene. The Parties did not provide to the Court with any account of the shooting from Thomas. In addition, Riehl testified that he could not see most of the encounter from where he was positioned—including Mr. Diamond's front side, Mr. Diamond's hands, or whether Collinson put his hands on Mr. Diamond. Riehl Dep. Tr. 36:12, 36:25, 37:5.

he posed an immediate threat that justified Boyes's use of lethal force. Plaintiff counters that Mr. Diamond's hand never left his pocket. In support, Plaintiff offers the Lacy and Wobrock Declarations. Dr. Lacy, the chief medical examiner of King County, Washington, opined on the nature and cause of Mr. Diamond's wounds. Dr. Wobrock, an accident reconstructionist, relied on the Lacy Declaration and other evidence to opine that Mr. Diamond's hand was in the sweatshirt's pocket at the time he was fatally shot.

## DISCUSSION

### A. Declaration of Dr. J. Matthew Lacy

Dr. Lacy is the chief medical examiner of King County, Washington.[4] He has been a medical doctor since 1999 and a forensic pathologist since 2004. He is qualified to opine on questions of forensic pathology. In forming his conclusions, Dr. Lacy reviewed Dr. Rebecca Millius's autopsy report and deposition, the medical examiner's report, 238 autopsy photographs, six photographs from the scene of Mr. Diamond's death, and screenshots of a digital 3D model of the scene. *See* Lacy Decl. ¶ 2. Dr. Lacy offers three opinions regarding the causes of the various wounds on Mr. Diamond's body. Of particular importance is Dr. Lacy's first opinion and his last opinion.[5] Dr. Lacy's first opinion is that the gunshot wound labeled as "Gunshot Wound A" on Exhibit 10 of his declaration is more likely than not a "re-entrance wound." *Id.* ¶ 3. In other words, Dr. Lacy concludes that the four gunshot wounds on Mr. Diamond's body were caused by three bullets, and that one of those bullets passed through Mr. Diamond's left arm

---

[4] Dr. Lacy has worked at King County since 2023. At the time of his declaration, Dr. Lacy was the Chief Medical Examiner of Snohomish County, Washington, a position he had held since 2020.

[5] Dr. Lacy further opines that the large bruise labelled as "Beanbag Shotgun Wound" on Exhibit 11 of his declaration is more likely than not caused by a beanbag round. Lacy Decl. ¶ 4.

before entering his chest, thus making that wound a "re-entrance" wound. *See id.* Dr. Lacy's last opinion is that the two wounds labelled "Taser Dart Wounds" on Exhibit 11 were more than likely caused by TASER darts. *Id.* ¶ 5.

The City Defendants argue for two reasons that the Lacy Declaration is inadmissible. First, they assert that the Lacy Declaration "does not articulate what specific facts or data were relied upon [by Dr. Lacy] in rendering [his] various opinions." Second, they assert that "the Lacy Declaration does not articulate any principles or methods upon which he relied and similarly fails to establish that any principles or methods were reliably applied in reaching his opinions." The County Defendants make similar objections.

At the evidentiary hearing, Dr. Lacy explained how his background as a medical examiner and forensic pathologist has given him extensive experience with wound classification, and specifically with gunshot wound classification. He testified that reviewing photographs of a decedent's body—instead of an in-person examination of the body—is a reliable methodology and standard practice in his field. He described techniques for examining bullet wounds and determining whether a particular wound is likely an entrance, exit, or re-entrance wound. Dr. Lacy discussed the difference in appearance, shape, and texture between entrance, exit, and re-entrance wounds. He also discussed distinctions between re-entrance wounds and wounds caused by bullets that have passed through an independent intermediate target.

Dr. Lacy then explained how he applied these principles to this case. He discussed what he observed about Gunshot Wound A, including its "oblong" shape, the distinct, broad abrasion ring around the wound, and the wound's alignment with the exit wound on Mr. Diamond's arm. Dr. Lacy also explained that these observations, the location of Gunshot Wound A in relation to the presumptive path that the bullet would have taken through Mr. Diamond's left arm before

entering his chest, and pattern recognition from years of experience, led him to conclude that Gunshot Wound A had the characteristics of a re-entrance wound, as distinct from an initial entrance wound.

Dr. Lacy also explained his expertise and approach with respect to TASER and other conduced energy devices. For example, Dr. Lacy noted how TASER darts produce small and distinct puncture wounds with variable[6] damage, such as bruising, around it. He also explained that evidence beyond the injury itself, such as the presence or absence of TASER probes embedded in the target's clothing, would support a conclusion that a TASER likely caused the wounds in question. Dr. Lacy then explained why he concluded that the Taser Dart Wounds on Exhibit 11 were more than likely caused by a TASER. He observed that these two wounds were consistent with the size and shape of TASER wounds.[7] He also observed that TASER darts were embedded in Mr. Diamond's clothes consistent with where the wounds appeared on his body.

Based on the contents of his declaration and his testimony at the hearing, the Court finds that Plaintiff has met her burden of showing that Dr. Lacy's conclusions about the classification of wounds on Mr. Diamond's body are sufficiently reliable to be considered at summary judgment. The Court therefore overrules Defendants' objections to the Lacy Declaration.

**B.  Declaration of Dr. Jesse Wobrock**

Dr. Wobrock is a forensic biomechanical engineer and accident reconstructionist. He received a Ph.D. in biomedical engineering and a Master of Science degree in kinesiology. He

---

[6] Dr. Lacy explained that factors such as how thick the target's clothing is may affect the size and nature of the surrounding damage.

[7] Dr. Lacy also explained that due to the location of these wounds (upper left arm and lower pelvic area), the wounds were likely not caused by "medical therapy" such as an intravenous line.

has undertaken considerable professional education in crime scene and shooting reconstruction, accident reconstruction, and forensic biomechanics. ECF 47-1 at 2-4. Dr. Wobrock has published extensively on these topics. *Id.* at 11-12. He is qualified to opine on issues of accident reconstruction and forensic biomechanics. In forming his conclusions, he reviewed Dr. Millius's autopsy report, the medical examiner's report, 238 autopsy photographs, 553 additional photographs of the scene and of Mr. Diamond's injuries, several deposition transcripts and accompanying exhibits, dispatch records (including audio radio transmissions, 911 calls, and written reports), a digital 3D model of the scene, transcripts of the officers' interviews with the CCSO, incident reports issued by the CCSO, a video reconstruction of the incident, and Dr. Lacy's report. Wobrock Decl. ¶ 2. He also personally inspected the scene. *Id.*

Dr. Wobrock offers four conclusions in his Declaration. First, primarily relying on Dr. Lacy's declaration, Dr. Wobrock concludes that it is more likely than not that Mr. Diamond's left hand was in his pocket, and his arm by his side, when he was shot. *Id.* ¶ 3. Second, Dr. Wobrock concludes that based on the entrance wound on Mr. Diamond's left arm, it is more likely than not that Mr. Diamond's hand could not have been either raised to point a gun or moving away from his pocket when he was shot. *Id.* ¶ 4. Third, Dr. Wobrock concludes that it is more likely than not that any movement made by Mr. Diamond's left arm was an involuntary response to electrical current from the TASER. *Id.* ¶ 5. Finally, Dr. Wobrock concludes that the shots fired by Officer Boyes "could not have occurred as a response to Mr. Diamond taking his hand out of his pocket because the bullet would not have entered his left arm" if he had been pulling his left arm away from his body at the time he was shot. *Id.* ¶ 6.

The City Defendants raise the same objections to the Wobrock Declaration that they raise to the Lacy Declaration. They further argue that Dr. Wobrock's conclusion has no valid factual

basis. The County Defendants object that Dr. Wobrock's testimony contradicts some of the officers' accounts, wherein they claim that the TASER had no meaningful effect on Mr. Diamond. They further argue that Dr. Wobrock primarily discusses evidence of the position of Mr. Diamond's *upper* left arm, but then offers an opinion about Mr. Diamond's left *hand.* Finally, the County Defendants argue that Dr. Wobrock failed to account for the possibility that Mr. Diamond pulled his gun, was shot in the torso, and *then* potentially moved his arm back to his waist before a final bullet passed through his arm and chest, causing Gunshot Wound A.

At the hearing, Dr. Wobrock discussed his expertise in biomechanics and methodology in cases such as this one. He explained that he first considers the evidence available to him—such as photographs and reports—and applies biomedical, anatomical, and physiological principles to that evidence. As part of this analysis, he considers factors such as perception-reaction time. He then uses computer models to run various simulations of what happened to determine what series of events was most likely.

Dr. Wobrock discussed how he applied these methods to this case. He explained that based on the timing of the officers' commands for Mr. Diamond to take his hands out of his pockets in relation to when they started shooting, and the necessary position of Mr. Diamond's arm given that Gunshot Wound A was a "re-entrance wound" and needed to align with Mr. Diamond's upper left arm, Mr. Diamond's left hand was likely still in his pocket when he was shot. Dr. Wobrock further explained that even though Gunshot Wound A and its corresponding arm wound are on Mr. Diamond's upper body, Dr. Lacy's observations about those wounds were still probative in determining the placement of Mr. Diamond's left *hand* based on principles of anatomy and physiology. Finally, he explained that based on his review of the evidence, assuming the TASER had correctly deployed based on much of the evidence

presented, the electrical current more likely than not caused any movement by Mr. Diamond's hand.

Based on the contents of his declaration and his testimony at the hearing, the Court finds that Plaintiff has met her burden of showing that Dr. Wobrock's conclusions about Mr. Diamond's hand placement are sufficiently reliable to be considered at summary judgment. Defendants' objections go the weight, and not the admissibility, of this evidence. The Court therefore overrules Defendants' objections to the Wobrock Declaration.

**Declaration of Mr. Scott DeFoe**

The City Defendants also move to strike the portions of the DeFoe Declaration (ECF 48) that are directed towards the City Defendants. Scott DeFoe is a 26-year veteran officer of the Los Angeles Police Department. DeFoe Decl. ¶ 3. Mr. DeFoe specializes in police procedures, practices, and tactics and has testified in numerous uses of force cases. *Id.* ¶¶ 1, 3. The City Defendants object to Mr. DeFoe's opinion on various grounds.

The City Defendants object to Mr. DeFoe's first opinion that Collinson, Wetherbee, and Boyes failed properly to communicate with Mr. Diamond before using force. The City Defendants argue that "Mr. DeFoe does not specify whether Officers Boyes or Wetherbee['s] roles were communicative or merely cover officers." The City Defendants, however, do not explain why DeFoe's opinion would apply differently to a "communicative" as opposed to a "cover" officer.[8] The Court thus holds that this objection goes to the weight, not admissibility, of this declaration.

---

[8] Moreover, none of the parties dispute that Wetherbee *did speak* to Mr. Diamond during the encounter.

The City Defendants next argue that Mr. DeFoe's fifth opinion, that the officers exhibited a "gross lack of situational awareness and fundamental tactical errors," is "entirely irrelevant as it addresses only California law." The Court disagrees with this characterization. To support this opinion, Mr. DeFoe primarily relies upon his knowledge of how officers are trained to use lethal and nonlethal force. It is "[i]n addition" to this experience that he bases his opinion on a case that interpreted negligence law in California. The Court acknowledges that any references to California law likely will have little probative value to federal and Oregon law claims. But because Mr. DeFoe's opinion does not, as Defendants suggest, rest *only* on California law, the Court declines to exclude this evidence from consideration at summary judgment.

The City Defendants also object to Mr. DeFoe's sixth and seventh opinions on the ground that these opinions provide legal conclusions. Mr. DeFoe's sixth and seventh opinions are that Mr. Diamond's behavior never rose to the level of resistive, assaultive, or life-threatening at the time the officers used force, and thus that the use of less-than-lethal (sixth opinion) and lethal (seventh opinion) force was inappropriate and unreasonable.

The Ninth Circuit has "repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016) (emphasis in *Hangarter*). Accordingly, the Ninth Circuit has affirmed the exclusion of expert testimony when the testimony was intended to instruct the jury about whether the conduct at issue violated a statute, explaining that "[s]uch testimony would, in effect, instruct the jury regarding how it should decide the key question whether [the defendant] violated a statute and thus acted improperly." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th

Cir. 2008). The "prohibition of opinion testimony on an ultimate issue of law recognizes that, when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Diaz*, 876 F.3d at 1197 (quotation marks omitted) (emphasis in original).

Despite that general prohibition, Rule 704(a) states that an "opinion is not objectionable just because it embraces an ultimate issue." *See also Hangarter*, 373 F.3d at 1016 ("It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." (alteration in *Hangarter*) (quotation marks omitted)). The following example, provided by the Advisory Committee on Evidence Rules, demonstrates how the categorical bar on expert opinions as to legal conclusions, as recognized by the Ninth Circuit in the cases cited above, is consistent with Rule 704(a): "[Under Rule 704(a)], the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." Fed. R. Evid. 704(a) advisory committee's note to 1972 amendment. Whereas the first question directly asks for "testimony "on an ultimate issue of law," *see Nationwide Transp.*, 523 F.3d at 1059, the second asks for opinions that merely "embrace[]" that ultimate issue, *see* Fed. R. Civ. P. 704(a).

The Ninth Circuit has clarified that there are circumstances in which an expert's discussion about an ultimate issue may overlap with an ultimate issue of law and still be admissible. If a term "does not have a 'separate, distinct and specialized meaning' in law" than it has in the vernacular or in the industry at issue, an expert may use that term even if it has a legal meaning. *Diaz*, 876 F.3d at 1198 (quoting *United States v. Volkman*, 797 F.3d 377, 387, 389-90 (6th Cir. 2015)). Thus, "[w]ith respect to inadmissible legal opinions, the question is whether the

terms used by the expert witness 'have a specialized meaning in law' or 'represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1059 (9th Cir. 2024) (quoting *Diaz*, 876 F.3d at 1199).

The Court finds that the phrase "unreasonable force" has a specialized meaning in the law. *See Diaz*, 876 F.3d at 1198 (finding persuasive the Fourth Circuit's conclusion that terms such as "deadly force" and "unreasonably dangerous" have specialized legal meaning). The Court, however, declines to exclude Mr. DeFoe's sixth and seventh opinions in their entirety from consideration at summary judgment. Although Mr. DeFoe ultimately opines that Defendants' use of force was "unreasonable," that opinion comes at the end of a broader discussion of police tactics, how TASERs and beanbag shotguns work, and the various options available to officers in similar situations. Expert witnesses may discuss standard law enforcement practices and offer their opinion about whether the defendant's conduct aligns with those standards. *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir. 1991) ("Fed. R. Evid. 702 permits expert testimony comparing conduct of parties to the industry standard." (superseded on other grounds by statute as stated in *Paeste v. Gov't of Guam*, 624 Fed. App'x 448 (9th Cir. 2015)); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (citing *Davis* for the proposition that "testimony of plaintiffs' police practices expert that officers violated law enforcement standards [is] properly received"). Mr. DeFoe's opinions about whether Defendants' conduct aligned with generally applicable law enforcement standards and practices may—and, indeed, should—be considered at summary judgment.[9] The Court notes,

---

[9] The City Defendants cite the Supreme Court's decision in *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 616-617 (2015), which states that "[e]ven if an officer acts contrary to her training . . . that does not itself negate qualified immunity where it would otherwise be warranted" and thus, "a plaintiff cannot avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was

however, that it does not consider Mr. DeFoe's ultimate legal conclusion that the Defendants engaged in "unreasonable force" or "excessive force." Further, whether Mr. DeFoe may state that opinion in that specific form *in front of a jury*[10] is a question to be resolved later, likely at the final pretrial conference.

Finally, the City Defendants object to Mr. DeFoe's last opinion that some of the defendant officers failed to intervene before other officers' use of force on Mr. Diamond. Defendants argue that this opinion is not relevant because Plaintiff makes no claim about a failure to intervene in her Complaint. The Court agrees with the City Defendants' general statement that a plaintiff may not "effectively amend" a complaint by raising new theories in response to summary judgment. *See, e.g.*, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010). But Plaintiff here does not appear to be raising new theories. Instead, she uses the DeFoe Declaration—including this final opinion—to support her existing allegations of excessive force, battery, and negligence. Thus, the Court declines to exclude this opinion from consideration at summary judgment.

---

imprudent, inappropriate, or even reckless." The Court notes that this passage discusses the *weight* of an expert opinion in a qualified immunity analysis, not the *admissibility* of that evidence in the first place. Thus, the Court does not view *Sheehan* as a basis for excluding the DeFoe Declaration at summary judgment.

[10] District courts in this circuit limit the extent to which experts may discuss the concept of "excessive" or "reasonable" force before a jury. *See, e.g.*, *Dold v. Snohomish County*, 2023 WL 123335, at *2 (W.D. Wash. Jan. 5, 2023) ("A jury, not an expert, must decide whether the deputies deployed reasonable force under the totality of circumstances."); *Garza v. City of Los Angeles*, 2017 WL 4162203, at *5 (C.D. Cal. Sept. 18, 2017) (explaining that "conclusions from police officers or experts regarding whether [an officer] acted with excessive force would inappropriately infringe on the province of the jury."). Even if Mr. DeFoe is limited from opining about this ultimate legal conclusion, however, that may not limit him from discussing his other opinions, as previously discussed.

**C.  Declaration of Mr. James McIntyre**

All Defendants rely on the McIntyre Declaration (ECF 38) in support of their motions for summary judgment. Mr. McIntyre, an attorney and former prosecutor, offers his assessment of the facts and concludes that, at the time in which Boyes, Wetherbee, and Collinson used force against Mr. Diamond, probable cause existed that Mr. Diamond had committed a variety of criminal offenses. Plaintiff objects to the McIntyre Declaration and urges the Court to disregard this evidence at summary judgment. Plaintiff argues that whether probable cause exists is a legal conclusion that may not properly be provided by an expert witness at summary judgment. The City and County Defendants respond that the McIntyre Declaration may assist the Court in analyzing the issues raised by Defendants' felonious conduct defense under Oregon Revised Statutes § 31.180.

For the reasons provided in the Court's analysis of the DeFoe Declaration, the Court declines to exclude the entirety of the McIntyre Declaration from consideration at summary judgment. Although Mr. McIntyre ultimately concludes that Defendants had probable cause to arrest Mr. Diamond, which is a legal conclusion that the Court will not consider, his declaration also discusses Mr. Diamond's conduct and whether *that* conduct constituted a felony. Thus, Mr. McIntyre's opinions regarding Mr. Diamond's conduct may be considered at summary judgment. As with the DeFoe Declaration, however, the Court defers for later resolution the extent to which, if at all, Mr. McIntyre may discuss the concept of "probable cause" with the jury.[11] The Court also defers discussion of Plaintiff's related objection that Mr. McIntyre, an

---

[11] Indeed, courts in this circuit find that opinions about whether probable cause existed may constitute improper legal opinions. *See, e.g.*, *Struk v. Bush*, 2011 WL 5827196, at *6 n.7 (S.D. Cal. Nov. 18, 2011) ("Although an expert may testify regarding relevant practices and procedures, he may not offer an opinion on the ultimate legal issue of whether probable cause existed in the case before the Court."); *Gong v. Jones*, 2008 WL 4183937, at *5 (N.D. Cal. Sept. 9, 2008) ("Courts regularly prohibit experts from testifying on the ultimate issue of whether

attorney, may not discuss probable cause or excessive force because Mr. McIntyre is not a police officer.

Plaintiff also argues that the McIntyre Declaration is irrelevant to the Court's evaluation of Defendants' motions for summary judgment because it fails to analyze the facts in the light most favorable to Plaintiff. This summary judgment standard, however, applies to *courts*, not to witnesses—including experts—who provide evidence. *See, e.g.*, *Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792 at *4 (N.D. Ill. Feb. 1, 2021) (explaining that "there is no reason to think that the [summary judgment standard] would apply to the witnesses themselves" and that "[i]mposing another layer of favorable interpretation on the witness herself would only restrict her ability to offer her expert opinion."). Thus, the Court overrules this objection.

## CONCLUSION

The Court overrules Defendants' objections, *see* ECF 53, 55, to considering the expert declarations of Dr. Lacy, Dr. Wobrock, and Mr. DeFoe at summary judgment. The Court also overrules Plaintiff's objections, *see* ECF 44, to the expert declaration of Mr. McIntyre at summary judgment. The Court will consider all four declarations in ruling on Defendants' pending motions for summary judgment and will issue a separate Opinion and Order resolving those motions.

**IT IS SO ORDERED**.

DATED this 10th day of February, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

there was 'probable cause' for an arrest." (collecting cases)); *see also Stuart v. United States*, 23 F.3d 1483, 1487 (9th Cir. 1994) (concluding that the district court did not abuse its discretion in excluding opinion testimony because the expert was "not as well-qualified as the trier of fact to answer" the question about the existence of probable cause).