# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CHELSEA DIAMOND**, as personal representative of the estate of **DOUGLAS DIAMOND,** deceased,<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF SANDY**, a municipal corporation, **CLACKAMAS COUNTY, MICHAEL BOYES, WILLIAM WETHERBEE,** and **SEAN COLLINSON**,<br><br>Defendants. | Case No. 3:22-cv-346-SI<br><br>**OPINION AND ORDER** |

Jesse A. Merrithew, Noah A.F. Horst, and Norah Van Dusen, LEVI MERRITHEW HORST P.C., 610 SW Alder Street, Suite 415, Portland, OR 97205. Of Attorneys for Plaintiff.

Lauren E. Nweze and David C. Lewis, CIS LITIGATION, 15875 Boones Ferry Road, Suite 1469, Lake Oswego, OR 97035. Of Attorneys for Defendants City of Sandy, Michael Boyes, and William Wetherbee.

Stephen Lewis Madkour, Clackamas County Counsel, and Scott C. Cieko, Assistant County Counsel, OFFICE OF CLACKAMAS COUNTY COUNSEL, 2051 Kaen Road, Oregon City, OR 97045. Of Attorneys for Defendants Clackamas County and Sean Collinson.

**Michael H. Simon, District Judge.**

Plaintiff Chelsea Diamond, as the personal representative of the estate of Mr. Douglas

Diamond, sues the City of Sandy ("City"), Michael Boyes, and William Wetherbee (collectively,

the "City Defendants"), along with Clackamas County ("County") and Sean Collinson

(collectively, the "County Defendants"). Plaintiff alleges that the acts and omissions of

Defendants violated Mr. Diamond's rights under the Fourth and Fourteenth Amendments to the

U.S. Constitution and state law. Plaintiff asserts a claim for excessive force under 42 U.S.C.

§ 1983 against Defendants Boyes, Wetherbee, and Collinson in their individual capacities

("Individual Defendants"). Plaintiff asserts a claim of municipal liability pursuant to § 1983

against the City for failure to train Boyes. Plaintiff also asserts claims for wrongful death

pursuant to Oregon Revised Statutes ("ORS") § 30.020 *et seq.* for the intentional and negligent

acts of Defendants. Defendants separately have moved for summary judgment. For the reasons

described below, the Court grants in part and denies in part Defendants' motions.[1]

## STANDARDS

### 1. Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

---

[1] The Court previously held a *Daubert* hearing and resolved issues relating to the admissibility of expert testimony. *Diamond v. City of Sandy*, 2025 WL 448003 (D. Or. Feb. 10, 2025). The Court does not believe that oral argument would assist in resolving the pending motions. *See* LR 7-1(d)(1).

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc.*, 251 F.3d at 1257. Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

### 2.  Evidentiary Objections at Summary Judgment

In evaluating objections to evidence at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Sandoval v. County of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"); *Block v. City of Los*

*Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.").

At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); 56(c)(4) (establishing that a declaration in support of summary judgment must present "facts that would be admissible in evidence"). For example, in *Fraser* the Ninth Circuit considered a diary's contents as evidence to defeat a motion of summary judgment, despite a hearsay challenge, because the contents of the diary "could be admitted into evidence at trial in a variety of ways," including that the witness "could testify to all the relevant portions of the diary from her personal knowledge." *Fraser*, 342 F.3d at 1037. "Because the diary's contents could be presented in an admissible form at trial, we may consider the diary's contents in the [movant's] summary judgment motion." *Id.*

## BACKGROUND

### A.  Calls to Emergency Dispatch about Mr. Diamond

The first phone call to emergency services about Mr. Diamond occurred at 7:03 p.m. on July 2, 2020. *See* ECF 40-6 at 1. Mr. Diamond's ex-partner, Kerri Jo Shinn, contacted the County emergency services after receiving a text message from Mr. Diamond stating: "I[']m a bad shot . . . the first one didn't do it." *See id.* at 2. Ms. Shinn told the emergency dispatcher that

she was not sure whether Mr. Diamond was trying to commit suicide or trying to "get to her." *Id.* She also stated that Mr. Diamond owned guns, had a history with alcohol, and that, except for his dog, Mr. Diamond was alone at his residence. *See id.*

In response to Ms. Shinn's call to emergency services, Deputy William Anthony Montoya contacted Mr. Diamond by phone. *Id.* at 3. Montoya reported that, in response to a question about whether he was experiencing thoughts of suicide, Mr. Diamond responded: "Why would I ever do that? I have a chocolate lab I need to take care of." *Id.* Montoya asked Mr. Diamond about the text sent to Ms. Shinn, and Mr. Diamond "reiterated never wanting to hurt himself." *Id.* Montoya's dispatch notes conclude that Mr. Diamond said that "he was retired [law enforcement] and would call if he had suicidal ideations in the future." *Id.*

The second call to emergency services about Mr. Diamond came at 10:20 p.m. that same night, when Mr. Diamond's daughter, Desiree Diamond, called for a welfare check on Mr. Diamond. *Id.* at 5. Ms. Diamond stated that her father was "speaking in finalities," and had told her that "he's done and can't do it anymore." *Id.* at 6. When she had asked Mr. Diamond if she could come visit him, he apparently told her that "he won't be there tomorrow." *Id.* Ms. Diamond also reported that her father's partner, Ms. Shinn "recently left him," and that her father was "a retired cop," with "access to firearms." *Id.* Ms. Shinn also reported that Mr. Diamond "may be drinking tonight," and that he had been diagnosed with cancer only a few days ago. *See id.* at 7.

Deputy Chayse Nelson wrote in the dispatch records that he then contacted Mr. Diamond, who said that he was "[definitely] not going to kill or hurt himself." *Id.* Nelson further explained that Mr. Diamond was "just upset about breaking up with his girlfriend and said some dramatic things." *Id.* Mr. Diamond told Nelson that he would call his daughter. *Id.*

The third call to emergency services about Mr. Diamond happened the following day, July 3rd, at 11:36 a.m. *Id.* at 9. Ms. Shinn again contacted emergency services after she had reportedly received a phone call from Mr. Diamond in which he "told her to come take care of his dog," and "said something about 'taking a bullet.'" *Id.* at 10. Ms. Shinn also reported that Mr. Diamond was retired law enforcement, he lived alone, and that she had just broken up with him the day before and moved out after a 30-year relationship. *See id.* Ms. Shinn further reported that Mr. Diamond owned at least four different firearms and told emergency services where in his residence he stored each one. *Id.* at 11.

In response to Ms. Shinn's call, Jared Riehl, a recruit deputy[2] with the Clackamas County Sheriff's Office ("CCSO"), attempted to call Mr. Diamond several times, but Mr. Diamond did not answer. *Id.* at 12. Riehl left a message sometime shortly after noon. *Id.* at 12; *see also* Riehl Depo. Tr. 14:23-15:6 (ECF 45-8 at 5-6) (describing Riehl's attempts to contact Mr. Diamond by phone). Riehl then called Ms. Shinn. ECF 40-6 at 12. Ms. Shinn informed Riehl that she was going to have one of Mr. Diamond's children attempt to get a hold of Mr. Diamond, and that she would call dispatch back with an update. *Id.* Riehl advised Ms. Shinn that "since [Mr. Diamond] is alone and armed, we would not be responding to the location since it could provoke a violent outcome." *Id.*; *see also* Riehl Depo. Tr. 15:20-23 (describing the CCSO's decision not to make in-person contact with Mr. Diamond at that time).

The dispatch logs indicate that a few hours later, at 2:28 p.m., Riehl again called Ms. Shinn. ECF 40-6 at 13. Ms. Shinn stated that she had been on the phone with Mr. Diamond

---

[2] Riehl had been with the Clackamas County Sheriff's Office since October 2019 and was undergoing 18 months of training to become a Deputy. ECF 31-110 at 6 (Grand Jury Tr. 67:18-25). Deputy Gabriel Adel was Riehl's field training officer. Riehl Depo. 10:23-24 (ECF 45-8 at 4).

when Riehl called. *Id.* Ms. Shinn told Riehl that Mr. Diamond had told her that she would not be able to get a hold of him after 7 p.m. that night, but then Mr. Diamond had called her back to try to get her to come over for dinner. *Id.* Ms. Shinn reported that although Mr. Diamond had mentioned shooting himself in other recent conversations, Mr. Diamond did not mention suicide in that phone call. *Id.*

The final call to emergency services about Mr. Diamond came in about twenty minutes later, at 2:47 p.m. ECF 40-7 at 1. Mr. Diamond's son-in-law, Kenneth Robinson, called 9-1-1 to report that he had been on the phone with Mr. Diamond when he "heard a loud pop in the background." *Id.* at 3. According to the dispatch logs, Mr. Robinson reported that Mr. Diamond told him that he had nothing left to live for and then Mr. Robinson had heard what he believed to be a gunshot. *Id.* at 5. The dispatch logs reflect that there were various attempts to call Mr. Diamond on the phone, but that the calls were either ringing once, got disconnected, or were going straight to voicemail. *Id.* at 6-7. No other resident of the RV park where Mr. Diamond resided appears to have called 9-1-1 to report a gunshot at that time. *See* Adel Depo. Tr. 26:14-19 (ECF 45-5 at 11); Collinson Depo. Tr. 28:12-16 (ECF 45-10 at 10).

## B.  Initial Arrival of Law Enforcement Officers to the Scene

Riehl and his supervisor Deputy Gabriel Adel arrived on the scene at 2:54 p.m., shortly after Mr. Robinson's call. ECF 40-7 at 6; Adel Depo. Tr. 21:14-21. Adel intentionally parked the car behind someone else's trailer to avoid being spotted by Mr. Diamond. Adel Depo. Tr. 27:6-8, 27:13-22. Riehl and Adel could not see Mr. Diamond from where they were parked, but they later testified that, at the time of their arrival, neither believed that Mr. Diamond had shot himself. *Id.* 25:14-18; Riehl Depo. Tr. 22:6-15. The deputies' goal, at that point, was to "get eyes" on Mr. Diamond to confirm that Mr. Diamond was still alive. Adel Depo. Tr. 27:2-5; Thomas Depo. Tr. 13:19-21 (ECF 45-9 at 4).

The deputies waited in the car until Deputy Christopher Thomas also arrived at the scene at 3:12 p.m. Adel Depo. Tr. 22:2-6. Adel had called both Thomas and Sergeant Sean Collinson beforehand to coordinate an approach plan. *Id.* 22:8-10. After Thomas arrived, Adel and Riehl exited the car. *Id.* 28:5. Adel brought along his rifle "because assuming that someone has a gun[,] we want to have an option that is superior to a handgun option." *Id.* 28:1-3. Adel and Riehl approached Mr. Diamond's trailer from the south, through a wooded area. *Id.* 28:5-7. After a distance, the deputies stood behind two trees from where they could see what they believed[3] to be Mr. Diamond's trailer. *Id.* 28:12-16. At this point, Adel and Riehl still had no visual on Mr. Diamond.

Thomas parked about fifty yards away from Mr. Diamond's trailer and could see the trailer from his car. Thomas Depo. Tr. 17:13-25. As Riehl and Adel approached from the south, Thomas—also carrying a rifle—remained hidden behind a tree. *Id.* 18:6-8, 40:5. Thomas describes in his deposition that when he first[4] saw Mr. Diamond, Mr. Diamond had his hands in the front of his sweatshirt pocket. *Id.* 20:5-8. As part of the deputies' coordinated plan, Adel and Riehl approached Mr. Diamond while Thomas provided long-range cover for the deputies. *See Id.* 14:6-11. Adel first saw Mr. Diamond when he walked out in front of his trailer, paused in front of his truck, and potentially set something down. Adel Depo. Tr. 42:4-13. Mr. Diamond then walked from the truck back to his trailer, before stopping and looking in Adel and Riehl's

---

[3] Adel previously had learned that Mr. Diamond owned a white truck, and he could see a white truck parked in the driveway, which indicated to him that the trailer was Mr. Diamond's. Adel Depo. Tr. 28:19-22.

[4] There are also conflicting accounts of who first spotted Mr. Diamond sitting outside of his trailer. *Compare* Adel Dep. Tr. 40:20-22 (Adel states that Thomas saw him first) *with* Thomas Dep. Tr. 18:9-12 (Thomas cannot remember who saw him first). This discrepancy does not appear to be material.

direction. *Id.* 42:14-19. Although Adel and Riehl were still standing behind trees, Adel believed

that at that moment, Mr. Diamond had spotted the deputies for the first time. *Id.* 42:18-19.

Adel, a former member of the CCSO's crisis negotiation team who had more than 400

hours of training on crisis communication, began to engage in conversation with Mr. Diamond.

*Id.* 9:6-10:10, 42:20-25. Adel said "something to the effect of police, let me see your hands or

take your hands out of your pockets, something like that," to which Mr. Diamond said something

"like no, or not gonna happen." *Id.* 42:20-43:1. "Pretty quickly," however, Adel realized that this

"tense" interaction "wasn't building rapport." *Id.* 41:8-11.

At about this time, both Thomas and Collinson spoke on their internal radio channel.

Thomas asked Adel "if this guy's not gonna get with the program should we just back out and

regroup?" *Id.* 44:12-13. According to Adel, Collinson responded "something to the effect of like

don't give up ground unless you have to." *Id.* 43:24-25. Soon thereafter, Adel "stopped paying

attention to the radio traffic and stuff, because now I'm trying to have a dialogue with a guy who

is armed . . . from the background that I know. . . he's in crisis, he's depressed, he's feeling

suicidal, and so I start to have a conversation with him." *Id.* 41:21-42:3.

Initially, given both distance and road noise, it was difficult for Adel to hear

Mr. Diamond. *Id.* 44:22-25. Mr. Diamond informed Adel that he would come closer—which

Adel told him not to do, because he believed Mr. Diamond was armed—but Mr. Diamond

approached anyway. *Id.* 45:4-8. Mr. Diamond crossed the street and stood on the edge of the

pavement, still a short distance away from where Adel and Riehl stood behind the trees.

*Id.* 45:10-14. The first part of the conversation remained tense; Mr. Diamond claimed to see

through Adel's de-escalation tactics and informed him that that "this can end one of two

ways . . . I get shot, you get shot." *See* Tr. of Recorded Conversation with Diamond ("Conv.

Tr.") 3:23:30, 3:26:13-19 (ECF 31-9 at 1, 2). Mr. Diamond further told Adel that "I'd almost

rather have you shoot me," *id.* 3:26:38, and when Adel told him that he would "rather not do

that," Mr. Diamond responded: "All I've gotta do is take about another 10 steps. You know

what's in my pocket. It's in my left hand," *id.* 3:26:39-43. Mr. Diamond repeatedly indicated to

Adel that he wanted Adel to shoot him. *See, e.g.*, *id.* 3:30:25 ("I'd rather take another fifteen

steps and have you do it for me."). Adel "could see he had a handgun in his left hand which was

inside his sweatshirt pocket" because "the gun [was] printing through the material of the

sweatshirt." Adel Depo. Tr. 46:25-47:3.

Despite these tense initial exchanges, Adel began to "build rapport" with Mr. Diamond

over the next few minutes of their conversation. *Id.* 45:17-46:8. They discussed family, pets,

relationships, and Mr. Diamond's career in law enforcement. *Id.* Although initially reluctant to

speak, Mr. Diamond started to engage in the conversation. *Id.* 47:21-48:5. During the

conversation, Adel informed Mr. Diamond that he had done nothing wrong and was free to go.

*Id.* 46:5-8. Mr. Diamond's final words to Adel were "I'm too old, I'm too tired . . ." Conv.

Tr. 3:37:16.

## C. Arrival of Other Officers and Mr. Diamond's Death

While Adel and Mr. Diamond were conversing, Collinson arrived on the scene. Collinson

first got involved with this incident earlier that morning, when Riehl had called him twice to

update him on the phone calls about Mr. Diamond and ask for direction from Collinson.

Collinson Depo. Tr. 17:5-8; 18:16-20; 20:3-12 (ECF 31-11 at 7, 8, 10). Over the course of these

phone calls, Collinson learned about Mr. Diamond's background, including that he was former

law enforcement, was suicidal, and had access to firearms. *Id.* 19:8-13. Collinson—concerned

for Ms. Shinn's safety—told Riehl to discourage Ms. Shinn from visiting Mr. Diamond in

person. *Id.* 24:19-21. He also advised Riehl to ask someone else from the family to contact

Mr. Diamond to engage him in conversation that way. *Id.* 24:24-25:1. After the call from

Robinson, however, Collinson gave the order for units to respond to the scene. *Id.* 27:2-5.

At 2:28 p.m., Collinson also started travelling to the scene from his residence in Canby.

*Id.* 28:21. As he drove to the scene, he listened to Adel's conversation with Mr. Diamond

through the internal radio. *Id.* 33:6-10. Upon hearing Thomas's statement that Mr. Diamond was

"not going with the program," Collinson gave the instruction to not "give up ground unless you

have to." *Id.* 41:15-22. Collinson later testified at his deposition that he gave this instruction

because he did not want the onsite deputies to lose track of Mr. Diamond's position or give him

an opportunity to access his other firearms. *Id.* 41:24-42:10.

       Upon arriving at the scene, Collinson parked a short distance away from the trailer.

*Id.* 51:19-21. Officers Wetherbee and Boyes pulled in behind him and parked their car; Boyes

later testified that as he and Wetherbee made the drive, he was reviewing the previous calls made

about Mr. Diamond and discussed with Wetherbee what they were going to do when they

arrived. Boyes Depo. Tr. 59:8-22 (ECF 40-1 at 21). When Collinson exited his car, he was able

to see a deputy facing away from him—he was not sure who—and standing by Mr. Diamond's

trailer. Collinson Depo. Tr. 55:1-6, 55:14-18. Collinson, Wetherbee, and Boyes observed

Mr. Diamond in front of his trailer. He was moving around with his hands in his pockets and

"didn't seem to be conversing with anybody." *Id.* 55:20-56:5. Collinson informed Wetherbee and

Boyes that they would "move up." *Id.* 56:8. He decided to approach Mr. Diamond without a

drawn weapon to appear less threatening. Decl. of Collinson (ECF 32) ¶ 32. Collinson stated,

however, that he would go "hands on," meaning that if needed, he would be the one to control

Mr. Diamond's hands. Collinson Depo. Tr. 56:19-23. Wetherbee was to provide "less lethal"

cover with his beanbag shotgun. *Id.* 56:6-7. "More by default than anything else," Officer Boyes

would provide lethal cover for the unit.[5] *Id.* 56:12-14. Collinson, Wetherbee, and Boyes proceeded to move towards the trailer.

      Collinson did not communicate to Adel, Thomas, or Riehl that he had arrived on the scene. Riehl Depo. Tr. 30:3-5; Thomas Depo. Tr. 27:15-18. Nor had Collinson communicated to Adel, Thomas, or Riehl what he intended to do when he arrived. Riehl Depo. Tr. 30:6-8; Thomas Depo. Tr. 27:19-21. Nor did he approach Adel, Thomas, or Riehl to speak to them after he arrived. Riehl Depo. Tr 30:9-11. Indeed, the first time that Adel, Thomas, and Riehl seemingly became aware that Collinson had arrived on the scene was when Collinson, Wetherbee, and Boyes appeared at the trailer and ordered Mr. Diamond to remove his hands from his pockets. *Id.* 30:12-15.

      As Mr. Diamond was explaining to Adel that Mr. Diamond was "too old" and "too tired," Collinson interrupted the conversation[6] and told Mr. Diamond to "[t]ake your hands out of your pockets sir." Conv. Tr. 3:37:24; *see also* Riehl Depo. Tr. 30:22-25 (stating that Adel was talking to Mr. Diamond when Collinson engaged). Mr. Diamond yelled for Collinson to get "the f*** out of here . . . Now!" Conv. Tr. 3:37:29-37. Mr. Diamond disengaged fully with Adel, turning instead to face the officers—whom Adel could not see—who had just arrived on the scene. Adel Depo. Tr. 53:10-12. Adel called out Collinson's first name and told Collinson to "[j]ust hold on," Conv. Tr. 3:37:34, 3:37:38, "in an attempt to try to have [Collinson] . . . acknowledge that I'm

---

      [5] Indeed, during his deposition, Collinson testified that he never informed Boyes that he would provide lethal cover. Collinson instead testified that he "believe[d] it was by default. I said that I was going to go hands on . . . Officer Boyes had his role based upon Officer Wetherbee already having the less lethal option." Collinson Depo. Tr. 56:19-25.

      [6] Collinson presents a different account of what happened. In his deposition, he testified that he felt afraid when Mr. Diamond turned to face him because "He's got a gun. He's had an opportunity to be in here for 15 minutes and *he's not talking to anybody, they're not engaged in a conversation*." Collinson Depo. Tr. 59:19-22 (emphasis added).

there or pause in whatever [Collinson] may be doing . . . I didn't know what [Collinson] was

doing." Adel Depo. Tr. 55:25-56:3. Collinson, however, did not respond. *Id.* 56:5.

With Mr. Diamond's attention now turned to Collinson, Wetherbee, and Boyes,

Collinson instructed Wetherbee to issue a warning to Mr. Diamond that Wetherbee would deploy

the beanbag shotgun if Mr. Diamond did not show his hands. Collinson Depo. Tr. 61:17-22.

Wetherbee did just that. *Id.* 61:25-62:2. Mr. Diamond did not comply. *Id.* 62:3-4. Wetherbee

then fired three beanbag shots at Mr. Diamond within the span of six seconds. Conv. Tr. 3:37:56-

38:01. According to Collinson, the first round was "a glancing blow," that caught Mr. Diamond

"more down towards his leg and off to the side." Collinson Depo. Tr. 62:6-8. Collinson's

original impression "was that it didn't hit him, it didn't have any effect." *Id.* Tr. 62:9-10.

According to Collinson and Wetherbee, the second shot and the third shot—which hit

Mr. Diamond's stomach area—seemingly had no effect on Mr. Diamond, either.[7] *Id.* 62:11-19;

Wetherbee Depo. Tr. 39:23-40:2 (ECF 31-14 at 9-10). Instead, Mr. Diamond looked at

Wetherbee and said something to the effect of, "if you f****** hit me with that thing again."

Wetherbee Depo. Tr. 40:1-2; Collinson Depo. Tr. 62:24-25; *see also* Adel Depo. Tr. 56:24-57:1

("He was yelling at Collinson and the other officers, used some profanity, telling them to like

knock it off."). According to Wetherbee, Mr. Diamond's hands were still in his pocket.

Wetherbee Depo. Tr. 40:3-5. Mr. Diamond did not make any movement towards the officers.

*Id.* 35:24-36:2.

---

[7] By contrast, Adel testified during his deposition that as the rounds hit Mr. Diamond, "he kind of hunched over a little bit as though . . . the abdomen was the area that he had gotten hit." Adel Depo. Tr. 56:17-21.

As Wetherbee began to reload his shotgun to fire another round, Collinson—believing that Wetherbee was either out of ammunition or the gun was jammed—drew his TASER.[8] Wetherbee Depo. Tr. 41:3-11; Collinson Depo. Tr. 63:1-4. Collinson deployed the TASER; one of the probes hit Mr. Diamond in the chest area, while the other landed on the ground. Boyes Depo. Tr. 79:10-13 (ECF 45-4 at 16); Collinson Depo. Tr. 63:11-17. Based on the sound the TASER made, Adel, Collinson, Wetherbee, and Boyes all believed the TASER was not working. Adel Depo. Tr. 58:12-21 (ECF 40-12 at 13); Collinson Depo. Tr. 63:19-24; Wetherbee Depo. Tr. 43:6-16 (ECF 40-14 at 11); Boyes Depo. Tr. 79:15-80:2. Then,[9] Mr. Diamond removed his right hand from his pocket and swung his arm to sweep off the TASER probe. Collinson Depo. Tr. 64:4-11.

Until this point, Boyes was still providing lethal cover at the "low ready" position, meaning that his firearm was pointed near, but not directly on, Mr. Diamond. Boyes Depo. Tr. 80:3-17. Boyes yelled out to Collinson for him to switch to providing lethal cover so Boyes could try using his own TASER. *Id.* 80:4-7. Believing that Collinson heard him, Boyes began to holster his gun and draw his TASER. *Id.* 80:23-25.[10]

---

[8] At his deposition, Collinson could not remember if he gave Mr. Diamond a warning to take his hands out of his pockets or be tased. Collinson Depo. Tr. 63:5-8. Boyes, however, recalled that Collinson offered "some sort of warning about getting tased or you're going to get tased or I'm going to tase you, something to that effect." Boyes Depo. Tr. (ECF 45-4 at 16) 79:8-10.

[9] Adel states in his deposition that he could not recall exactly when Mr. Diamond removed his right hand, but Adel did remember that Mr. Diamond used his right hand to sweep the TASER probe wires, and that Mr. Diamond's left hand remained in his pocket. Adel Depo. Tr. 57:5-14.

[10] Boyes later noted that his TASER ended up on the ground, but he could not remember when or how. Boyes Depo. Tr. 125:15-18.

After Collinson realized that his TASER had not worked, he dropped his TASER and "charged" Mr. Diamond, and Wetherbee followed behind him. Collinson Depo. Tr. 64:1; Wetherbee Depo. Tr. 43:16-17. The accounts of what happened next vary in amount of detail and are not entirely consistent. Each account is recited separately.

### 1. Adel

Adel recalls that when Collinson was "*probably within arm's length*, [Mr. Diamond] pulls something black[11] out of his pocket, it's in his left hand of the sweatshirt pocket. . . . [T]here's some other officers to the right of Collinson that are closing distance, and like pretty quickly after that black thing in [Mr. Diamond's] hand comes out I hear gunfire and then I close distance." Adel Depo. Tr. 59:2-10 (ECF 40-12 at 14) (emphasis added). Both Collinson and Mr. Diamond fell backwards to the ground, and someone called out that an officer was down. *Id.* 59:11-14, 60:8-9. Collinson informed the others that he had been shot in his left arm and hand. *Id.* 59:19-20. Wetherbee provided first aid to Mr. Diamond. *Id.* 59:23-60:1. Adel noted that a black Glock handgun lay on the ground on Mr. Diamond's left side. *Id.*

### 2. Riehl

Riehl could not see much of the encounter; after Collinson moved forward, "it was all very fast-paced." Riehl Depo. Tr. 36:6-7. He did not see Mr. Diamond's front side or hands, or whether Collinson even put his hands on Mr. Diamond. *Id.* 36:10-12, 36:22-37:5. As soon as Riehl heard shots fired, he "[i]mmediately holstered [his] firearm, and ran up to Sergeant Collinson's left side . . . and took over control of Mr. Diamond's right arm." *Id.* 37:6-12.

---

[11] Adel notes that he believes now that the object Mr. Diamond extracted was a handgun, but in the moment, that did not register. *See* Adel Depo. Tr. 59:5-6 (ECF 40-12 at 14).

### 3. Wetherbee

Wetherbee recalls that Collinson grabbed Mr. Diamond with both hands on Mr. Diamond's upper right arm. Wetherbee Depo. Tr. 43:17-19. "*Right when [Collinson] grabbed Mr. Diamond the left hand came out with the pistol.*" *Id.* 44:1-2 (emphasis added). Wetherbee disposed of his beanbag shotgun so he could pull out his own firearm, and then he heard three consecutive gunshots. *Id.* 44:5-11, 49:2-6, 71:15-25. Wetherbee saw Mr. Diamond fall straight backwards, and Collinson fell across Mr. Diamond's legs. *Id.* 49:9-12. Wetherbee moved forward immediately and started pulling Collinson up and away from Mr. Diamond so that he could start administering first aid to Mr. Diamond. *Id.* 49:18-25, 50:23-51:10.

### 4. Collinson

Collinson recalls that he was able to grab ahold of Mr. Diamond's right arm but was unable to get ahold of the left. Collinson Depo. Tr. 64:20-65:1. Collinson *then saw* Mr. Diamond's hand pulling out the end of a gun, and Collinson yelled out "he's got a gun." *Id.* 65:2-4. Collinson "was trying to keep [Mr. Diamond's] hands down so he couldn't pull the gun out." *Id.* 65:6-7. He "wanted [his] guys to be able to come in and grab [Mr. Diamond's] arms and we could detain him and take that gun away and make everybody safe." *Id.* 65:7-9. But Mr. Diamond "pulled a gun out of his pocket, and the next thing you know he's taking rounds and I'm taking rounds." *Id.* 65:10-12.

### 5. Boyes

Boyes recalls that Collinson caught Mr. Diamond high up on the right arm. He then narrates the following:

> I remember walking up, because I see Officer Wetherbee walking up. And Sergeant Collinson grabs his right arm, [Mr. Diamond's] right arm, and at that, around that time I see Mr. Diamond just pulling, just like tugging, it looks like something is getting caught in his kangaroo pocket with his left hand.

> And I'm immediately concerned because the tugging motion, he's not just like trying to take his hands out of his pocket, like his hand could easily get out of his pocket if he wanted it to, but he's got something, something's getting caught.
>
> And I see his elbow come out and I just slowly start to see a black handgun, and I can remember, I remember the magazine sticking out past his hand. And I'm familiar with guns, it looks like it was like an extended magazine in the gun.
>
> And I see it come out. And Sergeant Collinson's holding [Mr. Diamond's] right hand. And Sergeant Collinson drops his hand and takes a step back, and as I'm seeing, I see it's clearly a gun, and Mr. Diamond starts coming out and sweeping, like a sweeping motion, his elbow starts coming down and pointing it at Sergeant Collinson. I knew I had to shoot him.

Boyes Depo. Tr. 81:7-82:4 (ECF 40-1 at 32-33). Boyes noted that when "the gun start[ed] coming out," Collinson yelled "gun, gun, gun," and stepped back. *Id.* 91:24-92:2. According to Boyes, Collinson no longer had hands on Mr. Diamond. *Id.* 92:9-14. Boyes aimed for the center of Mr. Diamond's chest and began to shoot. *Id.* 92:6-8, 92:17-19. Mr. Diamond fell to the ground on his back, and Collinson landed on top of him. *Id.* 93:5-15. Boyes approached the two men and saw that Mr. Diamond was holding the gun in his left hand and "it was pointed kind of in the direction that we were approaching." *Id.* 94:2-5. Boyes kicked the gun away. *Id.* 94:6-7.

### 6. Expert Declarations of Drs. Lacy and Wobrock

Plaintiff offers the expert declarations of Dr. J. Matthew Lacy (ECF 46) and Dr. Jesse Wobrock (ECF 47).[12] Dr. Lacy, the chief medical examiner of King County, Washington, opined on the nature and cause of Mr. Diamond's wounds. Dr. Lacy first concluded the gunshot wound labeled as "Gunshot Wound A" on Exhibit 10 of his declaration is more likely than not a "re-

---

[12] The Court received testimony from both Dr. Lacy and Dr. Wobrock at the evidentiary hearing discussed in footnote 1. As explained in its February 10, 2025, Opinion and Order, the Court considers both experts' declarations at summary judgment.

entrance wound." Lacy Decl. ¶ 3. In other words, Dr. Lacy concluded that the four gunshot wounds on Mr. Diamond's body were caused by three bullets, and that one of those bullets passed through Mr. Diamond's left arm before entering his chest, thus making that wound a "re-entrance" wound. *See id.* He next opined that the large bruise labelled as "Beanbag Shotgun Wound" on Exhibit 11 of his declaration was more likely than not caused by a beanbag round. *Id.* ¶ 4. Dr. Lacy's last opinion is that the two wounds labelled "Taser Dart Wounds" on Exhibit 11 were more than likely caused by TASER darts. *Id.* ¶ 5.

Dr. Wobrock, forensic biomechanical engineer and accident reconstructionist, relied on Dr. Lacy's declaration, officer testimony, photographs of the scene, and an in-person inspection of the scene of the shooting to provide conclusions about Mr. Diamond's positioning at the moment he died. Dr. Wobrock offered two conclusions relevant to this motion. First, based on the alignment of the wounds on Mr. Diamond's body, it was more likely than not that Mr. Diamond's left hand was in his pocket, and his left arm by his side, when he was shot. Wobrock Decl. ¶ 3. Second, and relatedly, based on the entrance wound on Mr. Diamond's left arm, it is more likely than not that Mr. Diamond's hand could not have been either raised to point a gun or moving away from his pocket when he was shot. *Id.* ¶ 4.

**D.  Officer Boyes's Training**

Boyes graduated high school in 2015. Boyes Depo. Tr. 6:12-15 (ECF 40-1 at 2). Prior to working for the City, he worked as a campus safety officer at Clackamas Community College, *id.* 6:18-21, though he did not carry a firearm in this role, *id.* 7:7-9. He worked this job for approximately two years. *Id.* 7:10-14. He was also employed as a career technical assistant—and later an instructor—for a vocational high school, teaching a law enforcement class. *Id.* 9:16-21. He participated in the CCSO's cadet program. *Id.* 13:1-4.

Boyes applied to be a police officer with the City at the age of 21 or 22. *Id.* at 18:23-25.

He accepted the job in January 2020 and began work on March 24, 2020, right at the onset of the

COVID-19 pandemic. *Id.* at 21:15-24. At the time that Boyes accepted the job, he was told that

he would receive several weeks of onboarding training and policy review and would start police

academy[13] in April. *Id.* 22:5-9. Because of the pandemic, however, Boyes instead completed a

two-day firearm training, a two-hour course on defensive tactics and handcuffing, a four-hour

taser course, a one-hour course on using a stick and expandable baton, an additional two-hour

online course in defensive tactics, and four additional hours of firearm training. *See* Boyes Depo.

Tr. 24:19-24, 34:12-16, 35:1-3, 38:3-6, 38:21-39:6 (ECF 45-4 at 5-7, 9-10). He had completed

only the first of four phases of the Police Training Officer ("PTO") program—a field training

program with superior officers. *See id.* 42:3-18. At the time that Boyes fatally shot Mr. Diamond,

Boyes had not started—let alone graduated—the police academy program.

## DISCUSSION

**A. Evidentiary Objections**

The parties raise numerous objections to the evidence offered in support and in

opposition to Defendants' motions for summary judgment. Objections to expert opinion evidence

previously was addressed in a separate Opinion and Order.

### 1. 911 and Dispatch Call Recordings

Plaintiff objects to the County Defendants' exhibits 102, 103, 104 and 106 (ECF 31-2,

ECF 31-3, ECF 31-4, ECF 31-6) and to the City Defendants' exhibits 8, 9, 10, and 11 (ECF 41).

These exhibits are audio recordings of Mr. Diamond's family members' calls to emergency

---

[13] Police academy is a four month, 640-hour long course on a variety of topics including arrest procedure and legal standards, investigation tactics, and firearm use. Boyes Depo. Tr. 22:19-25.

services. Plaintiff argues that these recordings are not relevant to the Court's evaluation at summary judgment because none of the officers claim to have heard the recordings before their encounter with Mr. Diamond.[14] Defendants do not contest that the officers had not heard the audio recordings before arriving on the scene. Instead, the City Defendants argue that the audio of Mr. Diamond's family's calls to emergency services provide necessary context for the Court to understand the history leading up to the officer's uses of force, and that the recordings "circumstantially support" Wetherbee's and Boyes's uses of force. The County Defendants similarly argue that the recordings "corroborate" information in the CAD reports and "are indicative of the objective reasonableness of Sergeant Collinson's perceptions and beliefs."

"Only information *known* to the officer at the time the conduct occurred is relevant [to the excessive force inquiry]." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (emphasis added). The Court thus declines to consider these audio recordings at summary judgment.

### 2. Montoya and Nelson Declarations

Plaintiff objects to the declarations of Montoya and Nelson. Like Plaintiff's objections related to the audio recordings of the calls to emergency services, Plaintiff argues that neither of these officers spoke with Boyes, Wetherbee, or Collinson before their arrival on the scene and

---

[14] Instead, Boyes, Wetherbee, and Collinson appear to have relied on the computer-aided dispatch reports ("CAD reports"), which consist of emergency dispatchers' written summarization of relevant information about the situation for responding law enforcement personnel. Boyes testified in his deposition that before his arrival at the RV park, the only information he had about the situation was what was relayed through the CAD reports and communications over the radio. Boyes Depo. Tr. 103:3-10 (ECF 45-4 at 21). Wetherbee similarly testified in his deposition that he knew only what Boyes had read to him from the CAD reports. Wetherbee Depo. Tr. 29:14-25 (ECF 40-14 at 4). Collinson also appears to have known only the information relayed to him by Riehl based on the CAD reports and through communications over the radio. Collinson Depo. Tr. 18:16-19:1, 19:15-20:12, 21:6-14.

thus their declarations are irrelevant. The County Defendants respond that the testimony contained within the declarations of Montoya and Nelson corroborates the objective reasonableness of Collinson's actions. The City Defendants do not respond to Plaintiff's objection. For the same reasons provided in the preceding section, the Court excludes this evidence from consideration at summary judgment.

### 3. Sandy Police Department Debriefing

Finally, the City Defendants object to three statements[15] from Boyes and Wetherbee's depositions regarding the Sandy Police Department's debriefing meeting after Mr. Diamond's death. The City Defendants object to these statements as inadmissible evidence of subsequent remedial measures under Rule 407 of the Federal Rules of Evidence. "By its terms, [Rule 407] is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur." *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1103 (D. Or. 2013) (emphasis in original); *see also* Christopher Mueller & Laird Kirkpatrick, 2 Federal Evidence § 4:50 (4th ed. 2023) ("The reason [for finding Rule 407 inapplicable] is that such reports or inspections are not *themselves* remedial measures, and do not themselves even reflect decisions to take or implement such measures." (emphasis in original)).

Applying this framework, the Court does not find that any of these statements made during a debrief amount to evidence of *measures taken* to make an earlier injury less likely to

---

[15] The first is Boyes's statement that after the incident, "[i]t was decided that moving forward . . . we should try to get as much information as possible before we make any decision." Boyes Depo. Tr. 120:16-19. The second is Boyes's statement that the Sandy Police Department identified that a better tactical strategy would have involved "leaving the scene and maybe getting a little bit more information from Deputy Adel prior to making the decision to stay there." *Id.* at 119:21-24. The final statement is Wetherbee's testimony that after the debriefing, he learned that he needed "to be more informed about the entire situation, no matter what the situation is." Wetherbee Depo. Tr. 66:9-10.

occur. Nor does Plaintiff use these statements as evidence of measures taken. She does not argue

that the Sandy Police Department instituted new guidelines around the use of force or otherwise

changed existing protocols. She instead uses the statements to argue that "a reasonable officer in

[D]efendants' position would have obtained basic information from the officers on the scene,

thus preventing a needless and fatal escalation of the encounter between [Mr.] Diamond and law

enforcement." Thus, Plaintiff offers these statements to show the objective unreasonableness of

the alleged conduct and the feasibility of precautionary measures available to the officers. Under

Rule 407, the Court may admit these statements for this purpose. The Court accordingly

overrules the City Defendants' objections to these statements.

## B.  Excessive Force in Violation of the Fourth and Fourteenth Amendments

Plaintiff asserts against the Individual Defendants a § 1983 claim for excessive force.

Defendants offer two responses. First, Defendants argue that the Individual Defendants used

objectively reasonable force against Mr. Diamond. Second, Defendants argue that these law

enforcement officers are entitled to qualified immunity from civil liability. The Court addresses

each argument in turn.

### 1.  Excessive Force

"Under the Fourth Amendment, police may use only such force as is objectively

reasonable under the circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th

Cir. 2000). To determine whether the force used to make an arrest was reasonable, courts balance

"the nature and quality of the intrusion on the individual's Fourth Amendment interests against

the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396

(1989) (quotation marks omitted). Thus, the Court first "assess[es] the gravity of the particular

intrusion on Fourth Amendment interests," then "assess[es] the importance of the government

interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against

the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted). "Although on summary judgment we view the evidence in the light most favorable to [the nonmovant], 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396) (cleaned up).

"'[S]ummary judgment should be granted sparingly in excessive force cases,' especially 'where the only witness other than the officers was killed during the encounter.'" *Gallardo v. County of San Luis Obispo*, 476 F. Supp. 3d 1034, 1039 (C.D. Cal. 2020) (alteration in original) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014)). That is because "[i]n deadly force cases, the Decedent is, of course, not able to contradict the shooting officers' account of events." *Id.* Under such circumstances, a court "must carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts." *Gonzalez*, 747 F.3d at 791; *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (explaining that "in the deadly force context, we cannot 'simply accept what may be a self-serving account by the police officer'" (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)).

### a. Severity of Intrusions

There are three types of force at issue in this case, each rising to a different level of severity. The first use of force occurred when Wetherbee hit Mr. Diamond with three rounds from a less lethal beanbag shotgun. The Ninth Circuit has called the term "beanbag rounds" a "euphemism" that "grossly underrates the dangerousness of this projectile." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 n.13 (9th Cir. 2001). "Such force, though less than deadly, is

not to be deployed lightly." *Id.* at 1280.[16] The use of less lethal[17] ammunition is "permissible only when a strong governmental interest compels the employment of such force." *Id.* The second use of force occurred when Collinson used his TASER. The use of a TASER constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Finally, Boyes deployed deadly force against Mr. Diamond. Deadly force is reasonable only "if a suspect poses a *significant* threat of death or serious physical injury to the officer or others." *S.R. Nehad*, 929 F.3d at 1132-33 (emphasis in original) (quotation marks omitted).

### b. Government Interests

To evaluate the government's interest in using force, courts look to three primary factors: (1) "whether the suspect poses an immediate threat to the safety of officers or others," (2) "the severity of the crime at issue," and (3) "whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "most important" factor is the first listed factor. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). "These factors, however, are not exclusive." *Glenn*, 673 F.3d at 872. Rather, the Ninth Circuit instructs courts to "examine the

---

[16] As the Ninth Circuit explained, a beanbag shotgun is "a twelve-gauge shotgun loaded with beanbag rounds, which consist of lead shot contained in a cloth sack. It is intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike." *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (cleaned up).

[17] Beanbag shotguns are designated as "less-lethal" weapons instead of "non-lethal" weapons because they can cause serious injury or death if they hit "a relatively sensitive area of the body." *Glenn*, 673 F.3d at 871 (quotation marks omitted). Defendants argue that "the manner in which Officer Wetherbee deployed the less lethal shotgun is indicative of the reasonableness of his decision" because he was "aiming for a large muscle group with the express goal of achieving pain compliance, while at the same time intentionally aiming so as to avoid areas of [Mr.] Diamond's body which could have resulted in serious injury." The effect the shotgun had on Mr. Diamond is disputed. Although some of the officers state that the beanbags appeared to have little to no impact on Mr. Diamond, Adel said that he saw Mr. Diamond "hunch[] over," and photographs from the autopsy reveal that the beanbags caused heavy bruising.

totality of the circumstances and consider whatever specific factors may be appropriate in a particular case." *Bryan*, 630 F.3d at 826 (quotation marks omitted). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872.

### i. Beanbag Shotgun

When the Individual Defendants arrived on the scene, Mr. Diamond was talking to Adel. Although Mr. Diamond alluded to a shoot-out earlier in that conversation, he and Adel had transitioned to topics such as Mr. Diamond's relationship and Mr. Diamond's dog by the time the Individual Defendants arrived. Mr. Diamond was stationary. He kept a distance from Adel and Riehl.[18] He did not move towards the Individual Defendants when they approached. Although the officers were aware that Mr. Diamond had a gun in his sweatshirt pocket, Mr. Diamond had made no movements with his hands that would suggest he was pulling it out. He was not shouting or even using expletives. Indeed, he did not make any sort of "furtive movement, harrowing gesture, or serious verbal threat that might create an immediate threat." *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). To the extent that officers were worried about other residents of the park, there is no evidence from any party that anyone else witnessed the encounter or stood within range of Mr. Diamond's gun. Thus, a reasonable jury could find that Mr. Diamond did not pose an immediate threat at this stage of the encounter.

As for the second factor, there is a genuine dispute as to whether Mr. Diamond was committing any crimes when Wetherbee used the beanbag shotgun. Defendants assert that based

---

[18] The only time he moved closer to Adel and Riehl was early in the encounter to hear them better, and he explained what he was doing and why he was doing it. *See* Conv. Tr. 3:24:32 ("Okay, I'm going to step out to the woods so I can hear you better?").

on what the officers knew at the time, the Individual Defendants had probable cause to arrest Mr. Diamond for any of four offenses: unlawful use of a weapon in violation of Oregon Revised Statutes § 166.220 (a Class C felony), and three misdemeanors. In support, they provide the Declaration of James McIntyre (ECF 38),[19] who analyzed the statements Mr. Diamond had made to Adel early in their conversation (e.g., "This is going to end two ways, I'm going to shoot you or you are going to shoot me.") and evidence from the CAD Reports that Mr. Diamond had fired a gun. In response, Plaintiff highlights that no other person in that RV park reported hearing a gunshot and Adel testified that during the encounter, Adel told Mr. Diamond that Mr. Diamond had done nothing wrong and was free to go.[20] A reasonable factfinder could find that the Individual Defendants lacked probable cause to believe that Mr. Diamond had committed a crime.

With respect to the third factor, there was no evidence that Mr. Diamond was attempting to flee the scene. Nor is there evidence that he was actively or aggressively resisting arrest. That Mr. Diamond refused the officers' instructions to remove his hands from his pockets does not itself amount to a serious governmental interest in using significant force. *See Smith*, 394 F.3d at 703 (explaining that the plaintiff's resistance was not "particularly bellicose" because "[a]lthough [the plaintiff] refused to place both his arms behind his back, he did not attack the

---

[19] As discussed in its previous Opinion and Order, ECF 63, the Court does not consider *Mr. McIntyre*'s legal conclusion that the officers had probable cause to arrest Mr. Diamond before they used force on him. The Court instead relies on Mr. McIntyre's opinions about Mr. Diamond's conduct to the extent they support *Defendants'* assertion that the officers had probable cause.

[20] Adel stated at his deposition that he believed "[t]here was probable cause for [Mr. Diamond's] arrest." Adel Depo. Tr. 46:11. Adel did not, however, provide details about what the underlying crime was, or whether he communicated that belief to the Individual Defendants.

officers or their dog"); *Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (distinguishing between nonviolent resistance of arrest and violent actions towards officers). Mr. Diamond did not make any movements or scream at the officers in the interim between their instructions for him to show his hands and when Wetherbee deployed the beanbag shotgun.

The Court next turns to other relevant factors. Plaintiff does not dispute that Wetherbee warned Mr. Diamond before deploying the shotgun. On the other hand, not only were less intrusive alternatives available, but they seemed to be *working*. In a matter of minutes, Adel and Riehl had deescalated a tense situation to a calmer conversation. Adel had given Mr. Diamond permission to go back inside and carry on. There is no evidence to indicate that this tactic was failing, or that further conversation would have been futile. Finally, Mr. Diamond was experiencing an emotional crisis, though the parties dispute the extent to which that was apparent and impacted Mr. Diamond's clarity of judgment. The CAD Reports—which Riehl read and communicated to Collinson, who led the second group of officers—indicated that Mr. Diamond had broken up with his long-term partner the day before, had received a devastating medical diagnosis, and was suicidal. The Ninth Circuit has discussed the value of crisis negotiation as a tactic, especially in cases where a person is experiencing a mental or emotional crisis. As it explained in *Deorle*, "[i]n the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." 272 F.3d at 1283.

### ii.  TASER

There was one material change in Mr. Diamond's behavior in the approximately nine seconds between Wetherbee's final beanbag round and Collinson's use of the TASER: Mr. Diamond began to yell. The audio log records him reacting with "[y]ou do that f******* again—" and "[g]et out of here." There is no evidence that Mr. Diamond moved his arms or

moved closer to the officers. There is no evidence that he directly threatened to use force. To the extent that his phrase "[y]ou do that f****** again—" indicates a threat, the phrasing suggests that Mr. Diamond might have acted *if the officers used force again*—and not if they let him be. A reasonable jury could find that these reactions to the beanbag round still did not constitute an immediate threat.

Reading the record favorably to Plaintiff, as the Court must in evaluating Defendants' motions for summary judgment, the officers did not issue a force warning to Mr. Diamond before deploying the TASER. The audio log records Collinson commanding Mr. Diamond to take his hands out of his pocket but does not indicate that Collinson explained what would happen if Mr. Diamond refused to comply. Nor does Collinson remember giving that explanation. The record does not indicate that Collinson would not have had an opportunity to warn Mr. Diamond given that Collinson did *speak* to Mr. Diamond before deploying the TASER. *Cf. Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024) (finding that a warning was "clearly practicable" where an officer made time to warn fellow officers before deploying force). "[A]n officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." *Mattos*, 661 F.3d at 451. Thus, that Collinson did not issue a force warning before using the TASER weighs against Defendants in this analysis.

### iii. Deadly Force

Approximately eight seconds passed between Collinson deploying the TASER and Boyes firing his first gunshot. Within those eight seconds, Collinson charged Mr. Diamond to physically restrain him. To the extent that Mr. Diamond's conduct changed at all, it is the key dispute of fact in this case: whether Mr. Diamond drew his gun. Defendants highlight the testimony of the officers who claim they saw Mr. Diamond's hand pull out of his pocket with the gun. Plaintiff responds with the declarations of Drs. Lacy and Wobrock. When read together,

these declarations reflect that Mr. Diamond's left hand was still inside his pocket—not drawing his gun—when Mr. Diamond was shot.

"[W]hen a suspect points a gun in an officer's direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *Est. of Strickland v. Nevada County*, 69 F.4th 614, 620 (9th Cir. 2023) (quotation marks omitted). On the other hand, courts "have held over and over that a suspect's possession of a gun does not itself justify deadly force." *Calonge*, 104 F.4th at 48 (collecting cases). Indeed, "[i]f a person possesses a weapon but *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him." *Id.* at 46 (emphasis in original) (quotation marks omitted); *see also Peck v. Montoya*, 51 F.4th 877, 887-88 (9th Cir. 2022) ("[O]fficers may not kill suspects simply because they are behaving erratically, nor may they kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." (quotation marks omitted)).

Drs. Lacy and Wobrock provide evidence that Mr. Diamond did not remove his hand from his pocket and draw his gun. This evidence creates a material issue of fact as to whether Mr. Diamond presented an immediate threat at the time he was shot. It also creates an issue of fact as to whether the officers would have had probable cause to arrest Mr. Diamond for any weapons-related offense at this time. Defendants emphasize that the encounter happened in a crowded, public camping ground, but they do not show that other residents witnessed or were even within firing range of the encounter. Thus, "a threat to those nonexistent bystanders did not justify the use of deadly force either." *Calonge*, 104 F.4th at 46.

### c. Balancing

Balancing the significant intrusion of Mr. Diamond's Fourth Amendment interests against the officers' need for that intrusion weighs in favor of Plaintiff. Viewing the facts in the

light most favorable to Plaintiff, the force used against Mr. Diamond was significant, and the

government interests at stake did not justify the use of the beanbag shotgun, the TASER, or

ultimately, deadly force. Of course, what may result at trial is a different story. A reasonable jury

could find, for example, that although Mr. Diamond was armed, he did not make any furtive

movements with his gun at any point during the encounter. Alternatively, a jury may reasonably

discredit Drs. Lacy and Wobrock's opinions and believe the officers' assertion that Boyes shot

Mr. Diamond because he saw Mr. Diamond draw the gun. "But the choice between these

narratives requires weighing the evidence . . . and evaluating the various witnesses' credibility."

*Qualey v. Pierce County*, 2025 WL 306421, at *6 (W.D. Wash. Jan. 27, 2025).  And courts

"make no determination about the officers' credibility, because that's not our decision to make.

We leave it to the jury." *Cruz*, 765 F.3d at 1080.

### d.  Collinson's Liability for Boyes and Wetherbee

In addition to holding Collinson liable for his direct use of force against Mr. Diamond,

Plaintiff seeks to hold Collinson liable for Boyes and Wetherbee's uses of force under an

"integral participant" theory of liability.[21] This theory permits liability in two situations:

> those in which (1) the defendant knows about and acquiesces in the
> constitutionally defective conduct as part of a common plan with
> those whose conduct constitutes the violation or (2) the defendant
> sets in motion a series of acts by others which the defendant knows
> or reasonably should know would cause others to inflict the
> constitutional injury.

---

[21] The Court notes that this theory of liability is distinct from the Ninth Circuit's
"provocation rule," under which a law enforcement officer could be held for an otherwise
reasonable use of force where the officer intentionally or recklessly provoked a violent
confrontation that amounted to an independent Fourth Amendment violation. *See Billington v.
Smith*, 292 F.3d 1177, 1189-90 (9th Cir. 2002). The Supreme Court held this rule to be
incompatible with its excessive force jurisprudence. *See County of Los Angeles v. Mendez*, 581
U.S. 420, 428 (2017) (abrogating *Billington*). Thus, this doctrine is no longer a viable theory of
liability, and the Court agrees with Defendants that it cannot apply.

*Peck*, 51 F.4th at 889 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)) (cleaned up).

The County Defendants argue that the first pathway to liability does not apply because there "is no evidence whatsoever of a plan by Collinson that included the unlawful use of lethal force on Mr. Diamond." The Court disagrees. In his deposition, Collinson explained that before approaching Mr. Diamond, he spent "a few seconds" discussing with Wetherbee and Boyes "the plan" and "how we're gonna move forward." In other words, the purpose of this conversation was to allocate responsibility between the officers. Collinson instructed Wetherbee to use the beanbag shotgun, and "more by default than anything else Officer Boyes became somebody that was armed at the low ready." Indeed, Boyes testified that after Collinson instructed Wetherbee to use the beanbag shotgun, "it was just kind of . . . understood that [lethal cover] was the only . . . role that needed to be filled. I believe I said I'll be lethal cover because I knew [Wetherbee] was deploying a bean bag." Boyes notes that Wetherbee "acknowledged" his statement. Even if Collinson did not hear Boyes's comment, he would have seen Boyes take his gun out of his holster to keep it at the low ready position.

If Collinson did not want to authorize Boyes to use lethal force, he had the opportunity to make that clear after he had finished instructing Wetherbee. Instead, he proceeded with the shared assumption that Boyes would provide lethal cover. Thus, although Collinson did not state his assumption out loud, that allocation of responsibility was evidently understood by all three defendant officers—including the leader, Collinson—as being their shared plan. *Cf. Boyd v. Benton County*, 374 F.3d 773, 777 (9th Cir. 2004) (finding that officers were "integral participants" where each officer involved "knew of the plan . . . , did not object to that plan, and actively participated in its operation); *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009)

(finding no liability for an officer who "participated in neither the planning nor the execution" of the unlawful conduct).

The County Defendants further argue that the second pathway to liability does not apply because "the record is void of evidence indicating the Sergeant knew or could have known that his actions would result in an allegedly unlawful use of deadly force by another officer." The Court disagrees with this argument as well. First, Collinson says he knew Mr. Diamond had a gun in his pocket. He was aware of this fact *before* he charged Mr. Diamond and took hold of Mr. Diamond's arm. Collinson was also aware that his colleagues were armed, and that at least one of the officers—Boyes—was providing lethal cover. It is not unreasonable that suddenly rushing an armed, suicidal individual surrounded by armed officers could result in the use of deadly force. Thus, the Court denies summary judgment on Plaintiff's claim against Collinson for Boyes and Wetherbee's use of force under both pathways of the "integral pathway" theory.

### 2. Qualified Immunity[22]

#### a. Applicable Law

"The doctrine of qualified immunity protects government officials from liability for civil damages." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in

---

[22] In addition to arguing the issues of qualified immunity on the merits, Plaintiff asserts that the Court should reject Defendants' claims of qualified immunity because Congress expressly abrogated common law defenses when it adopted § 1983. This argument is preserved but the Court—which is bound by Ninth Circuit and Supreme Court precedent that recognizes qualified immunity defenses in § 1983 cases—declines to address it further.

turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (cleaned up). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not clearly established or the officer could have reasonably believed that his conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Abbasi*, 582 U.S. at 152 (quotation marks omitted). To be clearly established,

> "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent."

*Id.* (cleaned up). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in *Eng*).

Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc)). Courts must avoid the "danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742-43 (concluding that reasonable officers received fair warning from the "reasoning" of a case "though not the holding," even though "the facts of the case are not identical").

A court in this circuit first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd*, 374 F.3d at 781. After that, "in the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation marks omitted).

### b. Analysis

Mr. Diamond died on July 3, 2020. There were several cases that put Defendants on notice that their alleged actions were unlawful.

First, the Ninth Circuit has discussed at length the contours of using force when confronted with someone who is emotionally charged or suicidal. In *Glenn*, the Ninth Circuit denied summary judgment for officers who used beanbag rounds and then fatally shot a suicidal teenager who was holding a pocketknife to his throat. *See* 673 F.3d 864 (9th Cir. 2011). In its analysis of the *Graham* factors, the court observed that it is "aware of no published cases holding it reasonable to use a *significant* amount of force to try and stop someone from attempting suicide." *Id.* at 872 (emphasis in original); *see also Deorle*, 272 F.3d at 1283 ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."). Thus, the Individual Defendants are not entitled to qualified immunity to the extent that they acted to prevent Mr. Diamond from injuring or killing himself.

The Individual Defendants are also not entitled to qualified immunity for using force to escalate a situation. In *Deorle*, officers responded to a woman's distress call alleging that her husband was intoxicated, suicidal, and had "lost control of himself." 272 F.3d at 1276 (quotation marks omitted). At least thirteen officers arrived at the scene—evacuating the woman and her children and setting barricades around the house to prevent escape—and awaited a Special Incident Response Team and a team of negotiators. *Id.* For the next thirty to forty minutes, Deorle walked around his property, picking up and dropping various objects (including a hatchet, a crossbow, and lighter fluid) and screaming and taunting at officers. *Id.* at 1276-77. Despite these taunts, the officers did not observe Deorle touching or attacking anyone. *Id.* After consulting with his superiors and another officer on the scene, the defendant officer moved closer to Deorle and observed him for another "five to ten minutes." *Id.* at 1277. The defendant

officer then approached Deorle with a beanbag shotgun—even though the team of trained

negotiators had not yet arrived. *Id.* The officer did not warn Deorle that he would shoot him. *Id.*

Deorle started walking towards the officer. *Id.* The officer shot him with the beanbag shotgun.

*Id.* at 1278. Deorle was knocked off his feet, suffered multiple fractures to his cranium, and lost

an eye. *Id.* At the time the defendant shot Deorle, a team of trained negotiators was still en route

to the scene. *Id.* In evaluating the reasonableness of force, the Ninth Circuit focused on several

factors. For example, in the forty minutes that Deorle traversed his property, he attacked nobody.

*Id.* at 1281-82. He also had not attempted to flee or escape. *Id.* The officer had a clean line of

retreat. *Id.* The officer saw no bystanders in the area. *Id.* at 1282. Importantly, trained crisis

negotiators were on the way. Considering these circumstances, the court explained that "[t]here

was no immediate need to subdue Deorle before the negotiators who were part of the response

group could arrive and perform their 'essential function'; nor had those in charge made a

decision to subject Deorle to the use of physical force rather than await their arrival." *Id.* The

court concluded that "the governmental interest in using force capable of causing serious injury

was *clearly* not substantial." *Id.* (emphasis added).

The pertinent facts in *Deorle* resemble this case. At the time that Wetherbee first used his

beanbag shotgun, Mr. Diamond was engaged in verbal conversation with Adel and Riehl. He had

been in that conversation for at least fifteen minutes. Although some of his comments were

taunting in nature, Mr. Diamond was not shouting, kept his distance, and did not draw any

weapon. Mr. Diamond was making no effort to flee or escape. No officers reported bystanders in

the immediate area. Unlike in *Deorle*, Mr. Diamond remained stationary and did not approach

the Individual Defendants when they arrived. The officers had a clear opportunity to retreat. Not

only were trained negotiators involved, *but Mr. Diamond was in conversation with one*. Unlike

in *Deorle*, the Individual Defendants did not wait to consult with Adel—who was seemingly in charge of the scene until their arrival—before taking over. Indeed, they actively ignored Adel's request to wait. *Deorle* clearly establishes that the government interests in deploying the beanbag shotgun and TASER insubstantial or nonexistent.

The Ninth Circuit has also emphasized that "[a]ppropriate warnings comport with actual police practice" and that "[o]ur cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly." *Deorle*, 272 F.3d at 1284. The record suggests that Wetherbee *did* issue a force warning with respect to the beanbag shotgun. No officer issued a warning that Mr. Diamond faced the use of a TASER. There is no evidence to suggest that the Individual Defendants did not have time between the use of the beanbag shotgun and the TASER to explain to Mr. Diamond that they would use a TASER if he continued not to comply with their instructions. As in *Deorle*, there was "ample time" to give force warnings with respect to the TASER "and no reason whatsoever not to do so." *See id.*

Finally, the Court discusses clearly established law in the context of using force, including deadly force. The Ninth Circuit has clearly established that "[l]aw enforcement officials may not kill [people] who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997); *see also Qualey*, 2025 WL 306421, at *8 (asserting that *Glenn* "stands for an important proposition: the possession of a deadly weapon is alone not sufficient to make a use of force reasonable"). Instead, courts consider whether an armed person makes "a furtive movement, harrowing gesture, or serious verbal threat [that] might create an immediate threat." *George*, 736 F.3d at 838; *see also Qualey*, 2025 WL 306421, at *9 (asserting that *George* "stands for the proposition that deadly force should not be used simply because an individual is armed").

The parties discuss at length *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014). In that case, officers attempted to arrest a convicted felon, Cruz, after pulling him over for driving with a broken taillight. *Id.* at 1077-78. The officers had been told by a confidential informant that Cruz carried a nine-millimeter gun in his waistband. *Id.* After Cruz pulled to a stop in a parking lot and opened his car door, the officers shouted at him to get on the ground. *Id.* at 1078. Four officers later testified that Cruz ignored their commands and instead reached for his waistband. *Id.* Five officers opened fire, killing Cruz. *Id.* It was later determined that although Cruz had no gun on his person, a loaded nine-millimeter was found on the passenger seat of his car. *Id.* The facts of Cruz are not identical to the facts before the Court; after all, in denying summary judgment, the Ninth Circuit emphasized the fact that Cruz had not actually been armed. *Id.* at 1079 n.3. But there are also notable similarities. For example, the Ninth Circuit underscored "curious and material factual discrepancies" among the officers' accounts, including of their accounts of Cruz's hand placement when he was shot. *Id.* at 1080. As in *Cruz*, Mr. Diamond did not obey officer instructions. As in *Cruz*, the officers' accounts contain discrepancies and inconsistencies with each other. As in *Cruz*, construing the facts in the light most favorable to Plaintiff, particularly given the testimony of Drs. Lacy and Wobrock, Mr. Diamond did not draw a weapon.

Turning to its legal analysis of the case, the Ninth Circuit in *Cruz* further explained that given "Cruz's dangerous and erratic behavior up to that point," "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position *if* he reaches for a gun in his waistband." *Id.* at 1078 (emphasis added). On the other hand, the court reasoned, "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him." *Id.* (emphasis in original). *Cruz* thus clearly

establishes that deadly force is unreasonable where an armed individual makes no threatening gesture. Viewing the facts favorably to Plaintiff, Mr. Diamond did not make a threatening gesture. Although he used his right hand to sweep off the TASER probes, he did not extract his left hand, nor did he threaten to extract the gun. Therefore, the facts and legal discussion in *Cruz* sufficiently put officers on notice that shooting Mr. Diamond while he was not acting threateningly would have amounted to a violation of his clearly established rights.[23]

Thus, this case is distinguishable from *Blanford v. Sacramento County*, where officers apprehended a man who—armed with a sword—was wandering through a residential neighborhood and attempting to break into a private residence. 406 F.3d 1110, 1112 (9th Cir. 2005). When officers approached Blanford and asked him to drop the sword, he "raised the sword, and made a loud growling or roaring sound." *Id.* at 1112-13. The officers followed Blanford at a distance. *Id.* at 1113. When Blanford attempted to enter a home, the officers fired at him, rendering Blanford a paraplegic. *Id.* at 1113-14. The Ninth Circuit granted the officers qualified immunity, focusing in part on how Blanford reacted to the officers' commands by raising the sword and making threatening noises, and trying to break into a private residence where he could have potentially harmed someone. *Id.* at 1118-19. By contrast, as discussed, the record as read at this stage of litigation reveals that Mr. Diamond was not making threatening

---

[23] Decisions in this circuit issued after July 2020 that analyze the aforementioned cases support the Court's conclusion. *See, e.g.*, *Peck*, 51 F.4th at 888 (citing *Cruz* to emphasize that the Ninth Circuit has "repeatedly distinguished between a suspect who is actively reaching for a weapon and a suspect who is armed but not reaching for the weapon"); *Hart v. City of Redwood City*, 99 F.4th 543, 549-50 (9th Cir. 2024) (emphasizing the fact that the victim was brandishing a knife and *approaching* officers when they shot him); *Qualey*, 2025 WL 306421, at *10 (explaining that *Cruz, Glenn,* and *George* "clearly establish[] that an individual has a right to be free from excessive force, even when in possession of a firearm, so long as they are not a threat to others").

movements or gestures with his gun, nor was he attempting to move towards a populated area and potentially inflict harm on third parties.

### c. **Conclusion**

The Court denies summary judgment on Plaintiff's excessive force claims against the Individual Defendants. The Ninth Circuit's discussion in *George v. Morris* supports this conclusion. In *George*, officers responded to a woman's report that her husband, George, was unwell and was walking around the house with a loaded pistol. *George*, 736 F.3d at 832. When officers arrived at the scene, one saw George open the door to his second-floor balcony and come out onto the balcony with the barrel of his gun pointing down. *Id.* Twelve seconds after the officers broadcasted that the man had a firearm, they began to fire at him. *Id.* at 833. George fell to the ground and died at the hospital following surgery and admission to the intensive care unit. *Id.* Expert witness testimony called into question whether George had ever manipulated the gun or pointed it directly at the responding officers. *Id.* The Ninth Circuit affirmed the district court's denial of summary judgment, explaining that "we can neither credit the deputies' testimony that [George] turned and pointed his gun at them, nor assume that he took other actions that would have been objectively threatening." *Id.* at 838; *see also id.* (acknowledging the "potentially volatile and dangerous situation these deputies encountered" but concluding that "we cannot say they assuredly stayed within constitutional bounds without knowing what happened at the rear of the George residence during the time Mr. George walked out into the open on his patio and the fatal shot" (cleaned up)); *cf. Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1013-14 (W.D. Wash. 2020) (finding that summary judgment, including grant of qualified immunity, was inappropriate where genuine fact dispute existed about whether victim was holding gun when officers shot him).

### C.  Federal *Monell* Claim Against the City

Plaintiff asserts a § 1983 *Monell* claim against the City, alleging that the City failed to train Boyes on the lawful use of force. Defendants move for summary judgment on the ground that Plaintiff's *Monell* claim amounts to improper *respondeat superior* liability because there is no evidence that the City was on notice that its training of Boyes was constitutionally deficient and no evidence that the City acted with deliberate indifference.[24]

#### 1.  Applicable Law

Although a municipality or other local government is a "person" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 568 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipality had a "policy" that was the "moving force" behind a violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A plaintiff can demonstrate causation-in-fact "only if the injury would not have occurred 'but for' [the defendant's] conduct." *Chaudhry v. Aragón*, 68 F.4th 1161, 1169 n.11 (9th Cir. 2023) (quoting *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). In the context of *Monell* liability, a plaintiff can meet this burden by "establish[ing] that the injury would have been avoided had proper policies

---

[24] Defendants also argue that there is no evidence that Mr. Diamond suffered a constitutional violation; because the Court has already found a genuine issue of fact as to that issue in its excessive force analysis, no further discussion is necessary here.

been implemented." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quotation marks omitted). To demonstrate proximate causation, a plaintiff must establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022) *overruled on other grounds by Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1178 (9th Cir. 2024).

> First, the [municipality] may be held liable if it acted pursuant to an expressly adopted official policy. Second, the [municipality] may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (quotation marks and citations omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v. County of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

The Ninth Circuit recognizes that a local government body can be held liable under § 1983 for "policies" of inaction or omission. Some cases, generally older decisions, refer to this as a separate "path" to liability distinct from the "direct path" of the municipality *itself* violating

the plaintiff's rights or directing its employees to do so.[25] *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *see also Tsao*, 698 F.3d at 1144. In this separate path to liability, a municipality can be held responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1185; *see also Tsao*, 698 F.3d at 1143; *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). More recent cases, however, generally describe claims for such policies of inaction or omission as a type of custom or practice claim. *See, e.g.*, *Sabra*, 44 F.4th at 884; *Gordon*, 6 F.4th at 973. Regardless of how such claims are categorized, the Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability.

A policy of inaction or omission may be based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143; *see also Sabra*, 44 F.4th at 884. A plaintiff who alleges a policy of inaction, however, must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *Park*, 952 F.3d at 1141; *see also Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights,

---

[25] "Under [the] 'direct path' to municipal liability, a plaintiff must prove that the municipality acted with the state of mind required to prove the underlying violation, just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Tsao*, 698 F.3d at 1144 (quotation marks omitted).

a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he

was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force

behind the constitutional violation." (quotation marks omitted)).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal

actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61

(cleaned up). "Deliberate indifference exists when the need for more or different action is so

obvious, and the inadequacy of existing practice so likely to result in the violation of

constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately

indifferent to the need." *Park*, 952 F.3d at 1141 (cleaned up). "This requires a showing that the

facts available to the [municipality] put it on actual or constructive notice that its practices . . .

were substantially certain to result in the violation of the constitutional rights of its citizens."

*Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021) (cleaned up). Deliberate

indifference ordinarily is shown through "a pattern of prior, similar violations of federally

protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952

F.3d at 1142. Deliberate indifference also may be shown if a policy is "so facially deficient that

any reasonable policymaker would recognize the need to take action." *Id.* at 1141.

Under narrow circumstances, a municipality's failure to train its employees may be

considered a policy or custom. *See Canton*, 489 U.S. at 389. "Failure to train may constitute a

basis for *Monell* liability where the failure amounts to deliberate indifference to the rights of

those who deal with municipal employees." *Benavidez v. County of San Diego*, 993 F.3d 1134,

1153 (9th Cir. 2021) (citing *Canton*, 489 U.S. at 388-89). Under a failure-to-train theory, a

plaintiff at summary judgment must provide evidence "(1) of a constitutional violation; (2) of a

municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Id.* at 1153-54. "A [municipality's] failure adequately to train its employees to implement a facially valid policy can amount to deliberate indifference." *Long*, 442 F.3d at 1188. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). Absent a pattern of similar violations, failure to train "may amount to a policy of deliberate indifference if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *See Dougherty*, 654 F.3d at 900 (quotation marks omitted).

### 2. Analysis

Plaintiff alleges that the City allowed Boyes to work as an armed police officer despite "having no training in the lawful use of force." Because the City's failure to train was "all but certain" to lead to Boyes's unconstitutional use force, Plaintiff asserts that the City may be held liable under *Monell* and its progeny. Plaintiff offers evidence that at the time in which the incident occurred, Boyes had not completed, or even started, basic police academy training. Plaintiff also offers Mr. Scott DeFoe's expert opinion, ECF 48, that Boyes "was inadequately trained to be carrying a firearm while on patrol, much less to be placed in the position of lethal cover when responding to an armed, suicidal subject." DeFoe Decl. ¶ 38.

The City counters that Plaintiff offers no evidence of a pattern of similar violations such that it would be on notice that its approach to training Boyes was inadequate. The City concedes that Boyes was supposed to start basic training in March 2020, but that "COVID shut everything down and postponed" it. The City argues that Boyes possessed sufficient training on the constitutional use of force because he had training through his employment prior to joining the

Sandy Police Department, had participated and passed the Department's initial two-day firearms

training course, and had undergone use of force training through the Police Training Officer

(PTO) Program. The City contends that this training was sufficient to preclude *Monell* liability

for failure to train Boyes.

Although Plaintiff has not alleged a pattern of similar violations, the Court finds that that

the City may be liable under a theory of deliberate indifference in the way that it trained Boyes to

use deadly force. In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court provided

the following example of an obvious need to train:

> For example, city policymakers know to a moral certainty that
> their police officers will be required to arrest fleeing felons. The
> city has armed its officers with firearms, in part to allow them to
> accomplish this task. Thus, the need to train officers in the
> constitutional limitations on the use of deadly force, *see Tennessee
> v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be
> said to be 'so obvious' that failure to do so could properly be
> characterized as 'deliberate indifference' to constitutional rights.

489 U.S. at 390 n.10. This case presents an analogous situation. City policymakers know that

their officers will be required to engage with armed and potentially volatile civilians. Officers are

armed to keep themselves and others safe while responding to these situations. Thus, as in the

*Canton* example, the need to train officers in the constitutional limitations on the use of deadly

force is "obvious" such that failure to do so could properly be characterized as "deliberate

indifference." *See Connick*, 563 U.S. at 64 (noting the "obvious need for specific legal training"

where officers "must sometimes make split-second decisions with life-or-death consequences");

*id.* ("There is no reason to assume that police academy applicants are familiar with the

constitutional constraints on the use of deadly force.").[26]

---

[26] By contrast, the Ninth Circuit held that there was no basis for a deliberate indifference
theory for failing to train police officers not to commit sexual assault because there is "every
reason to assume that police academy applicants are familiar with the criminal prohibition on

In analyzing deliberate indifference, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 391. The Court finds a genuine dispute of material fact as to the adequacy[27] of Boyes's training. A reasonable jury may concur with Mr. DeFoe that Boyes was inadequately trained to carry a firearm on patrol or serve as the officer providing lethal cover in a volatile encounter. Of course, it will not "suffice to prove that an injury or accident could have been avoided if an officer had had *better* or *more* training, sufficient to equip him to avoid the particular injury-causing conduct." *Canton*, 489 U.S. at 391 (emphasis added). But in this case, a reasonable jury could find, for example, that the City's decision to allow Boyes into the field *before* completing police academy was unsound. Relatedly, a reasonable jury could find that the training that the City *did* offer Boyes—for example, the two-day firearms training course—was insufficient to train a new officer on how and when to use deadly force. Indeed, Officer Armando Olmos, who taught that two-day course, agreed that when he taught the class, it was his belief that his students would still be attending police academy shortly thereafter. Olmos Depo. Tr. 9:10-14 (ECF 45-7 at 6). Finally, a reasonable jury could find that the City's apparent decision to give weight to any familiarity Boyes had with excessive force standards as a vocational high school teacher was a defective one. Rather than indicating that Mr. Diamond's death could have been avoided if

---

sexual assault, as everyone is presumed to know the law." *Flores v. Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014). The Ninth Circuit explicitly distinguished such a situation from the one discussed in *Canton* and then further explored in *Connick*. *Id.* at 1159-60.

[27] The Court acknowledges that Plaintiff's complaint alleges that the City allowed Boyes to work as an armed officer despite having "*no* training" in the lawful use of force. Compl. ¶ 27 (ECF 1 at 7). In their motion for summary judgment, the City Defendants highlight this phrasing. Nevertheless, both Plaintiff and the City Defendants in their reply brief analyze this claim as alleging failure to *adequately* train—and not alleging failure to train *whatsoever*. Indeed, it is undisputed that Boyes received some training. Accordingly, the Court understands this claim as alleging failure to *adequately* train.

Boyes had received better or more training, these findings would address the adequacy of the training program itself. Because a reasonable jury could find a policy of deliberate indifference in a context where the need to train is obvious, the Court denies summary judgment of Plaintiff's *Monell* claim against the City.

**D. Wrongful Death Under Oregon Revised Statutes § 30.020 *et. seq.***

Oregon's "wrongful death statute places a decedent's personal representative in the decedent's shoes, imputing to the personal representative whatever rights, and limitations to those rights, that the decedent possessed." *Storm v. McClung*, 334 Or. 210, 223 (2002). Under Oregon law, "[t]he plaintiff in a wrongful death action must prove that a defendant's tortious act or omission was the cause-in-fact of the decedent's death." *Box v. Dep't of Or. State Police*, 311 Or. App. 348, 368, *adhered to as modified on reconsideration sub nom. Box v. State*, 313 Or. App. 802 (2021); *see also Joshi v. Providence Health Sys.*, 198 Or. App. 535, 538-39 (2005), *aff'd*, 342 Or. 152 (2006).

Plaintiff asserts a claim of wrongful death against all Defendants. Specifically, Plaintiff alleges that Boyes and the City, Wetherbee and the City, and Collinson and the County deployed intentional and unreasonable force against Mr. Diamond that led to his death. Plaintiff also alleges that Boyes and the City, Wetherbee and the City, and Collinson and the County acted negligently, which caused Mr. Diamond's death. Finally, Plaintiff alleges that the City negligently allowed Boyes into the field without first properly being trained. Defendants raise numerous arguments against these theories of liability.

**1. Battery**

Plaintiff's first theory of wrongful death is based on the intentional tort of battery. "The tort of battery requires (1) a person act with intent to cause harmful or offensive contact with another person, and (2) those actions directly or indirectly cause a harmful or offensive contact

with that other person." *Underwood v. City of Portland*, 319 Or. App. 648, 656-57 (2022) (citing *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249 (1976)). Defendants do not dispute that the Individual Defendants acted with intent to cause harmful or offensive contact with Mr. Diamond during their encounter. Instead, Defendants argue that the Individual Defendants' uses of force were justifiable and not excessive. Specifically, Defendants raise a variety of statutory defenses under ORS § 161.205(4) (officer acting under reasonable belief that victim was about to commit suicide); ORS § 161.235 (officer using reasonable amount of force under totality of circumstances to fulfill duty); and ORS § 161.239(1) (officer using force when there is an immediate threat to officer or bystander safety). As discussed in the context of Plaintiff's excessive force claim, however, genuine disputes of material fact preclude the Court from finding that the Individual Defendants' uses of force were reasonable as a matter of law.

### 2. Negligence

Plaintiff's second theory of wrongful death is based on the alleged negligence of all Defendants.[28] To prevail on a negligence claim under Oregon law, "a plaintiff must establish that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff." *Sloan on behalf of Est. of Sloan v. Providence Health Sys.-Or.*, 364 Or. 635, 643 (2019).

Plaintiff concedes that the theories of negligence contained within Paragraphs 35(b), 36(b), 37(d) (e), (f), and (g) of the Complaint cannot be sustained at summary judgment because

---

[28] Plaintiff does not argue or offer evidence that a special relationship or any other duty applies under the circumstances. *See Sloan ex rel. Est. of Sloan v. Providence Health Sys.-Or.*, 364 Or. 635, 644 (2019) ("[T]he test for ordinary negligence may not apply if a party invokes 'a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty.'" (quoting *Fazzolari ex rel. Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987)).

the conduct was intentional in nature. Accordingly, the Court grants summary judgment on Plaintiff's negligence claim to the extent that the claim rests on the officers' intentional conduct. The entirety of Plaintiff's negligence claim, however, does not rely on the officers' intentional conduct; Plaintiff also relies on the officers' negligent conduct.[29] Defendants argue that Plaintiff's negligence claim cannot survive summary judgment because it rests on the same set of facts as the § 1983 claim.

Although the Ninth Circuit has not spoken to this issue in a precedential decision, courts in this district generally bar plaintiffs from proceeding past the summary judgment stage on a negligence claim if that claim is based on the "same facts" that give rise to a § 1983 claim. *See, e.g.*, *Shilo v. City of Portland*, 2005 WL 3157563, at *1 (D. Or. Nov. 22, 2005) (the first decision applying this rule); *Whitfield v. Tri-Metro. Transp. Dist.*, 2009 WL 839484, at *10-11 (D. Or. Mar. 30, 2009); *Rodrigues v. Jackson County*, 2015 WL 404577, at *4 (D. Or. Jan. 29, 2015) (limiting the rule's scope to the summary judgment stage or later). The Court has also recognized that "[a]lthough a plaintiff may plead alternative theories of liability under state common law and § 1983, courts in this district do not allow a plaintiff to proceed with a cause of action for negligence based solely on the same facts underlying his or her § 1983 claim." *Gainer v. City of Troutdale*, 2016 WL 107957, at *11 (D. Or. Jan. 8, 2016), *aff'd*, 715 F. App'x 649 (9th Cir. 2018); *see also Pozos Leon v. Tillamook Cnty. Sch. Dist.*, 2018 WL 2175949, at *12 (D. Or. May 11, 2018) ("Plaintiffs may plead under § 1983 and, in the alternative, under negligence.

---

[29] The allegations that constitute negligent conduct are contained within Paragraphs 35(a), 36(a), 37(a), (b), (c), (d), and (h) of the Complaint.

Plaintiffs may not, however, advance both negligence and constitutional claims based solely on the same facts at summary judgment or trial.").[30]

In this case, in which Plaintiff asserts a negligence claim and a § 1983 excessive force claim, the negligence claim may move forward only if the alleged negligence pertains to facts other than the actual application of force. Some, but not all, of Plaintiff's allegations against the officer defendants pertain to facts other than those underlying her allegations of excessive force. For example, Plaintiff alleges that Boyes acted negligently by "[a]greeing to perform the duties of lethal cover when he knew or should have known that he lacked the essential training to do so." Compl. (ECF 1) ¶ 35(a).[31] Plaintiff also alleges that Wetherbee, who was training Boyes in the field, was negligent by "[a]llowing Defendant Boyes to act as lethal cover when he knew that Boyes was not trained to do so." Compl. ¶ 36(a). Plaintiff further alleges that Collinson was negligent in ordering Adel "not to back away from the situation," "[f]ailing to communicate his

---

[30] The Court notes, however, that not *every* judge in this district has adopted this approach. *See Johns v. City of Eugene*, 2018 WL 634519, at *13 (D. Or. Jan. 30, 2018) (acknowledging that it "has been the District of Oregon's consistent practice to bar negligence claims from proceeding to trial" when they are based on the same facts underlying a § 1983 claim, but declining to apply the rule because "nothing in Oregon's case law suggests that § 1983 and negligence claims are inherently incompatible"), *rev'd on other grounds*, 771 F. App'x 739 (9th Cir. 2019); *Bratcher v. Polk County*, 2022 WL 17184419, at *18 (D. Or. Sept. 1, 2022) (adopting the persuasive reasoning of *Johns* and allowing the plaintiff's negligence claim and § 1983 claim to proceed to trial), *report and recommendations adopted*, 2022 WL 17178266 (D. Or. Nov. 23, 2022). Some district courts in this circuit outside of the District of Oregon have similarly declined to take this approach. *See, e.g.*, *Est. of Lopez ex rel. Lopez v. City of San Diego*, 2014 WL 7330874, at *12 (S.D. Cal. Dec. 18, 2014), *aff'd sub nom. Est. of Angel Lopez v. Walb*, 2016 WL 6212018 (9th Cir. Oct. 25, 2016); *Dougall v. City of Tucson*, 2017 WL 1210340, at *7 n.16 (D. Ariz. Mar. 31, 2017).

[31] Boyes argues that that there is "no competent evidence" that his training was insufficient such that his decision to provide lethal cover would amount to negligence. But as the Court discussed in its analysis of Plaintiff's *Monell* claim, a reasonable jury could find that the City's training program was inadequate to prepare Boyes to provide lethal cover in the field. The discussions offered by Olmos and DeFoe create a genuine dispute of material fact that the Court will not resolve at summary judgment.

plan with Adel," "[f]ailing" to communicate with Adel about what had transpired during the 15-minute conversation with Mr. Diamond, "[f]ailing to consider whether any force was lawful" before directing Wetherbee to use the beanbag shotgun, and "[s]houting that Mr. Diamond had a gun." Compl. ¶ 37(a)-(d), (h). Plaintiff may move forward on her theory of negligence on these allegations.

The Court reaches a different conclusion regarding Plaintiff's wrongful death claim against the City. Plaintiff alleges that "the City of Sandy was negligent by allowing Defendant Boyes to work as an armed police officer without any training on lawful use of force." Compl. ¶ 38. Unlike Plaintiff's allegations against the individual defendants, this allegation rests on the same facts as Plaintiff's excessive force claim against the City. Therefore, Plaintiff may not move forward with her wrongful death claim as against the City under a theory of negligence.

### 3. Causation (Collinson and Wetherbee)

"[P]roof of causation in a wrongful death action typically requires 'a plaintiff to demonstrate that the defendant's negligent act or omission more likely than not brought about the death of the decedent.'" *Leonard v. Moran Foods, Inc.*, 269 Or. App. 112, 120 (2015) (alterations omitted) (quoting *Joshi*, 342 Or. at 159). "Conduct can be a cause-in-fact of harm without being the *only* cause of harm; it can concur or combine with other factual causes, as well." *State v. Turnidge*, 359 Or. 364, 471 (2016) (emphasis added). "For example, one person's conduct may occur early in the chain of causation and, depending on the circumstances, may be a 'but for' cause by resulting in a series of forces or events that follow to cause the injury, each of which is also a link in the causal chain without which the injury would not have resulted." *Id.*; *see also Haas v. Est. of Carter*, 370 Or. 742, 757 (2023) ("Most negligence cases include evidence of multiple causal factors, and in most cases, a but-for instruction correctly describes the necessary cause-in-fact relationship.").

Collinson and Wetherbee assert that Plaintiff fails to offer evidence that any conduct—except for Boyes's use of his firearm—was the cause-in-fact of Mr. Diamond's death. Of course, nobody disputes that Collinson and Wetherbee did not *literally* cause Mr. Diamond's death. But the concept of causation is not limited in that way; Collinson and Wetherbee may still be liable if a jury were to find that their conduct was a link in the causal chain that led to Mr. Diamond's death. *See Joshi*, 198 Or. App. At 542 ("[C]ausation-in-fact includes every one of the great number of events without which any happening would not have occurred. Each of those events is considered to be a cause-in-fact of a harm, even though other events were also necessary antecedents of the harm.") (cleaned up). Only about 22 seconds passed between Wetherbee's first use of force and Mr. Diamond's death. In that time, all three officers were communicating with each other and their actions were interconnected.[32] A reasonable fact finder, viewing the evidence in the light most favorable to Plaintiff, could conclude that Collinson's and Wetherbee's conduct, intentional or negligent, formed links in a causal chain without which the fatal injury to Mr. Diamond would not have occurred.

### 4. Felonious Conduct Defense

Defendants argue that Plaintiff's state-law tort claims fail under either the battery or negligence theory because ORS § 31.180 provides a complete defense. ORS § 31.180 provides in relevant part:

> (1) It is a complete defense in any civil action for personal injury
> or wrongful death that:

---

[32] For example, Wetherbee was the first one to deploy force against Mr. Diamond, which triggered additional uses of force when the beanbag shotgun appeared to fail to subdue Mr. Diamond. Collinson deployed the TASER and then charged Mr. Diamond. Boyes testified that he "knew" he had to shoot Mr. Diamond because Mr. Diamond allegedly endangered Collinson—who was physically restraining Mr. Diamond—by pulling his gun.

(a) The person damaged was engaged in conduct at the time
that would constitute aggravated murder, murder or a Class
A or a Class B felony; and

(b) The felonious conduct was a substantial factor
contributing to the injury or death.

(2) To establish the defense described in this section, the defendant
must prove by a preponderance of the evidence the fact that the
person damaged was engaged in conduct that would constitute
aggravated murder, murder or a Class A or a Class B felony.

. . . .

(5) The defense established by this section is not available if the
injury or death resulted from the use of physical force that was not
justifiable under the standards established by ORS 161.195 to
161.275.

There are genuine disputes of material fact that preclude the Court from determining that

the complete defense applies as a matter of law. Mr. McIntyre opines that Mr. Diamond pulling

out a gun would have constituted a substantial step towards two offenses: Attempted Murder of a

Police Officer (Class A) and Attempted Assault in the 1st Degree (Class B). McIntyre Decl.

¶¶ 22-24. But as discussed in the context of Plaintiff's § 1983 claim, there are genuine disputes

of material fact as to whether Mr. Diamond drew his gun. Viewing the evidence in the light most

favorable to Plaintiff, a reasonable jury could determine that Mr. Diamond did not engage in

conduct constituting a Class A or Class B felony. Moreover, even if a jury were to find that

Mr. Diamond *was* committing a Class A or B felony, that jury could still find, for the reasons

discussed in the excessive force analysis, that the force used against Mr. Diamond was not

justifiable under the circumstances. The Court declines to grant summary judgment on this

ground.

### 5.  Civil Commitment Defense

The County Defendants raise an additional defense under ORS § 426.335(6), which

states:

> A peace officer, individual authorized under ORS 426.233,
> community mental health director or designee, hospital or other
> facility, licensed independent practitioner or judge may not in any
> way be held criminally or civilly liable for actions pursuant to
> ORS 426.228 to 426.235 if the individual or facility acts in good
> faith, on probable cause and without malice.

ORS § 426.335(6). ORS § 426.228(1), which is the relevant accompanying provision in this

case, states that "[a] peace officer may take into custody a person who the officer has probable

cause to believe is dangerous to self or to any other person and is in need of immediate care,

custody, or treatment for mental illness." ORS § 426.228(1) then directs the peace officer to

transport that person to the nearest hospital or nonhospital facility as directed by the community

mental health program director.

Mr. Diamond, of course, was never taken into custody, let alone transported to a hospital

or nonhospital facility for mental health treatment. But more importantly, there is a dispute of

fact as to whether Collinson used force for the purpose of a peace hold.[33] Although Collinson

testified at his deposition that he "just wanted to take this guy into custody on a police officer

hold and get him some help," the record certainly does not indicate that he communicated that

plan to any of the five officers who were on the scene with him. The Court leaves the question of

the applicability of this defense to the jury and declines to grant summary judgment on this

ground.

---

[33] Adel—who is not a defendant in this case—indicated in his deposition that *he* was trying to assess whether to use a peace officer hold. Adel Depo. Tr. 39:16-21 (ECF 31-7 at 9). The record does not indicate that any of the individual defendants were aware of this plan.

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART Defendants' motions for

summary judgment (ECF 31, 37). The Court grants the motions as against Plaintiff's negligence

wrongful death claims that are based on the facts underlying Plaintiff's excessive force and

intentional tort theories of liability. The Court denies the motions in all other respects.

**IT IS SO ORDERED**.

DATED this 20th day of March, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge